U.S.

Superior Court of the District of Columbia
Criminal - Division

FILED

APR 30 2007

NANCY MAYER WHITTINGTON, CLERK
U.S DISTRICT COURT

Clinton T. Eldridge, #00545-000
P.O.3 8500    Florence, CO 81226
USP    Petitioner,

v.

United States of America,

Respondent.

Case: 1:07-cv-00776
Assigned To : Unassigned
Assign. Date : 4/30/2007
Description: HABEAS CORPUS

## Petition For Writ Of Habeas Corpus

Come now, Petitioner Clinton T. Eldridge
move the court, by Writ of Habeas Corpus, to
hold this matter for a evidentiary hearing, and
to with draw the plea of guilty. Therefore,
petitioner state for the reasons herein, the
writ should issue.

## Relevant History

On February 6, 1984, the grand jury handed
down a 37-count indictment, charging
petitioner of alleged, rape, robbery, burglary
and other assorted offense which are questionable

2.

On February 28, 1984, petitioner filed the only pro trial motion for discovery, regardless of counsel, he had known intentions from the start. On March 9 1984, at a Status Hearing, the government proffered its evidence, clothing, a ring, vaginal swabs, blood, hair and photographs, also it would call a expert. Ex. "B" Petitioner discovery motion was filed before the hearing. Ex. "H" On May 14, 1984, the case was called for trial, however, petitioner pleaded guilty to 9 counts. On July 1, 1984, petitioner was sentence to 40 to 120 years. In early 1985, petitioner filed a 23-110 motion to challenge the guilty plea, ineffective assistance of counsel and discovery matters. The court appointed counsel on October 17, 1985. On April 30, 1987, the court began holding evidentiary hearing, then a year later, on May 24, 1988, denied petitioner to withdraw his guilty plea, and for a new trial. The one issue raised by counsel was the new added ninth count to the original eight count plea agreement. In this petition, petitioner is feeling the whole up where, the Superior Court, and the Court of Appeals fail to do, to correct the "darkness of the miscarriage of justice."

3.

Counsel appealed the decision, the Court of Appeals reversed and remand to vacated count 30, and for resentencing. _Eldridge vs United States_, 618 F.2d 690 (D.C. 1977) (_Eldridge I_) at Exh. "A". On remand, petitioner moved to have the government to provide discovery, namely, for all FBI lab reports, etc. The ones provided will be discussed below. On July 30, 1975, the court vacated count 30 only to increased count 34 from 10 to 30 years to 15 to 45 years to reach the original sentence. Counsel appealed the resentencing, and petitioner argued the issue of the FBI lab reports. _Eldridge vs United States_, Nos. 95-C0-999 & 96-C0-1455 (1999) (_Eldridge II_) Exh. "B". On November 1, 2005, petitioner filed another D.C. Code § 23-110 motion, presenting he is "actually innocent" of the charges based on the FBI lab reports. The court denied the petition, thus, it was appealed. The Court of Appeals, on April 33, 3003, _Eldridge vs. United States_, No. 02-C0-533 (_Eldridge III_) Exh. "C". In each proceeding, the merits regarding the issue of "actually innocent" was not decided based on the FBI lab reports.

4.

Issue I; Disconnection Of Evidence

1. Prior to petitioner filing his Motion for Discovery on February 28, 1984, Ex. "A", there were three (3) FBI lab reports prepared namely, report of Julie McKenzie, December 23, 1983; report of Harriet Neil, January 26, 1984; and report of Julie McKenzie February 24, 1984. All attached hereto.

2. At the Status Hearing on March 9, 1984, Ex. "B", the following took place:

The Court: Has discovery been completed?

Mr. Tatem: No. Your Honor.

The Court: Why not?

Mr. Tatem: "There are some reports regarding
"in-fact"        scientific evidence; I was
              given three of them just received. I
              understand there is more coming."

Mr. Tatem is referring to the above mention lab reports. At the hearing, he did not inform petitioner.

5.

The Court further stated:

The Court: There are no motions pending?

Mr. Tatum: No. Your Honor.

It appears that the court and counsel were not concern about petitioner's motion, surely, the government did not. The court asked the following:

The Court: What physical evidence do you have?

Mr. Hall: Your Honor, we have clothing. Also a hair, and vaginal swabs, blood, hair, photographs. And at this time. Your Honor, that's the extent as far as I know.

This misrepresentation and misleading by Mr. Hall should not have been allowed by counsel. It denied petitioner and counsel to test the strength of the government's case, before pleading guilty. At the time, the government had the above three reports, there were no blood, vaginal swabs or hair (pubic or otherwise) or semen that link

6.

petitioner to the crime of rape regarding the above victim(s). See Exps. "K," "KK", and "M".

3. During the evidentiary hearing, the court, government, and counsel alleged that "jewels" and a "haircut" was removed from petitioner's basement/room, even the Barrett allude to the same. Ex. "F". The Barrett asked petitioner about these items at the hearing. Ex. "G" page 121-122. At no time did anyone ask petitioner about the alleged gray ski hat with a Playboy bunny on it, and a navy T-shirt hip length jacket. The first time such was mention was May 18, 1984 by the government. Even if true, it was a violation of the Fourth Amendment, there was no search warrant nor consent by anyone. The exclusionary rule bars the admission of evidence from a illegal search. Weeks v. United States, 232 U.S. 383, 34 S. Ct 341, 58 L. Ed 652 (1914); it was the government's burden to prove consent. Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct 2793, 111 L. Ed. 2d 148 (1990) petitioner's mother or others could not give consent for police to search petitioner's room. United States v. Whitfield, 939 F.2d 1071 (D.C. Cir. 1991); Stoner v. California, 376 U.S. 483, 84 S.Ct 889, 11 L. Ed. 2d 856 (1964). The government did not refer to these items as

7.

evidence at the Status Hearing. As Ex. "H", a non-dated, unsigned document, it refer to these items being removed from petitioner home with "warrant". Petitioner disagree. See Exps "A" & "G". It also appear to have a incriminating statement by petitioner, which should have been suppress. e.g. Wong Sun v. United States, 371 U.S. 471, 83 S. Ct 407, 9 L. Ed. 2d 441 (1963)

4. The government stated it would prove in other cases the victims identified alleged items of petitioners that were removed from his home. Petitioner wore the alleged items when he was arrested. See United States v. Carter, 475 F.2d 349 (D.C. Cir. 1973) "a mans wears a fur coat and that may help witnesses to identify him, but it does not establish a pattern of criminal conduct, there was no evidence of a connection scheme or plan embracing commission of all of the offenses it was prejudicial error to join trial of charges." em. added at 350. See Presley v. Boggiani, 225 F. Supp. 95 (D.D.C. 1964). In the case, it was no search warrant or consent to search the residence after he was in custody. Testimony concerning the clothing technically was stricken, but the Court further concludes that where there was an interconnected statement to the jury

8.

that it disregarded the stricken testimony, and followed by any further elaboration that it was the jury's duty not to consider such evidence on the question of petitioner's guilt, there is no ground to apply the doctrine of harmless error. The receipt and treatment of the testimony concerning the clothes are thus another ground to issue the writ. dd

8. Assume for a moment petitioner's mother or another family member gave police consent to search petitioner's room, it's nevertheless a violation of petitioner's rights. Petitioner had a legitimate expectation of privacy under the Fourth Amendment. *Fatas v. Illinois*, 439 U.S. 128-140-45, 99 S. Ct. 421, 58 L.Ed.2d 387 (1978). The Court of Appeals in *United States v. Whitfield*, 939 F.2d 1071 (D.C.Cir 1991), held that warrantless search of defendants' bedroom pursuant to mother's consent was invalid. Cf. *United States v. Matlock*, 415 U.S. 164, 99 S.Ct. 988, 39 L.Ed.2d 242 (1974). Id at 1075. Compare *United States v. Kimoto*, 151 F.3d 255 (9th Cir 1993)

9.

9. The government have not met its burden if consent was given, either by petitioner or a familiar member. e.g. <u>Bumper v. North Carolina</u>, 391 U.S. 545, 88 S.Ct 1258, 20 L.Ed.2d 797 (1968), similar to <u>Whitfield</u>. In <u>Wright v. United States</u>, 608 A2d 763 (D.C. App. 1.992) the Circuit of Appeals, Steadman, J.; held that defendant was entitled to hearing on issues of trial counsel's failure to <u>suppress</u> evidence seized during search of defendant's bedroom dresser, but with putative consent of defendant's father. <u>Wright's</u> principal was focus on appeal is on his claims of ineffective assistance of <u>counsel</u> in failing to move for the suppression of the evidence found in his bedroom dresser. The court considered the validity of this claim by reference to the familiar standards of <u>Strickland vs. Washington</u>, 466 U.S. 668, 104 S.Ct 2052, 30 L.Ed.2d 674 (1984).

10. The alleged "<u>navy blue hat with a Playboy bunny on it, and a navy blue hip length jacket</u>" was critized by the government, at the plea hearing, it stated:

10.

to this event relating to count 33 of (P.S.I)

The Court: What would you expect your evidence
to have been, Mr. Hall, in the
above matter had gone to trial?

Mr. Hall: Also we would have shown that
certain clothing owned by Mr.
Eldridge, himself was identified
after it had been removed by
police officers from Mr. Eldridge's
home identified by those victims
as clothing belonging to the person
that had assaulted and robbed them,
that person was wearing on the
day of the assault and the day
of the robbery. (Plea Hearing, at
33 - 34 (May 14, 1984)

If true, did the police have a search warrant?
Did the police obtain consent? if so, from
who?. See Wright v. Maryland State, 608 A.2d
763 (W.C. App. 1993); United States v. Whitfield,
939 F.2d 1071, 1075 (D.C. Cir. 1991); Shecky v.
Burroughs, 228 F. 2d 95 (D.C. 1964).

11.

Thereby, any alleged seized items relating to or not relating to this case from petitioner's basement room violated the Fourth Amendment right appealed to petitioner. Counsel should have filed to suppress such illegal items. E.g., Wright v. United States, 608 A2d 763 (D.C. App. 1992). Counsel's conduct violated petitioner's Sixth Amendment right to effective assistance of counsel. Kimmelman v. Morrison, 447 U.S. 365, 106 S.Ct 25-74, 91 L.Ed2d 305 (1986); Strickland, supra. Trial counsel's performance was deficient, the issue of not filing a motion to suppress any items removed from petitioner's room, when it's known no search warrant was use and consent not given, can not justify counsel's actions, which petitioner was denied to test the strength of the government's case. The government did state it had items of clothing belonging to petitioner that was identified by victim. This go directly to identification of petitioner when alleged items were seized without a warrant or consent, had counsel pursue this issue, any such evidence would have been inadmissible at trial, therefore, identification would have been lacking, the prejudice was sufficient to undermine the outcome of a trial. 466 U.S. at 687, 694

12.

11. Petitioner rely on *Murray v. Carrier*, 477 U.S. 475, 106 S.Ct 2639, 91 L.Ed.2d 547 (1986)("petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.")

Issue 3: Petitioner is Actually Innocent Of The Crime Related To Victim Gales McKenzie (GM)

12. See Ex. "K", report dated December 23, 1983 shows a list of items that may have been tested regarding (GM) and petitioner. The report also state no transfer of textile fibers was detected between (GM) and petitioner. From the way the government explain it the plea hearing, that petitioner and the victim were on the couch while he assaulted her. (July 19, 1984, Plea hearing, pg 53). At the status hearing, the following took place. Ex "18" at 2

The Court: When did you first have a meeting with Mr. Hall about discovery in this case?

Mr. Tatem: When did we meet?

13.

Mr. Hall: On March 7th

The Court: Wednesday

The government held their report and denied it to the defense for three months and a half. This report was completed, one of which the government was misleading and overreaching to the court and defense counsel, that it had blood, vaginal swabs and hair that link petitioner to the rape of victim (JD) count 33 when in fact he did not. The court then asked:

The Court: Any expert or scientific testimony?

Mr. Tatems: None at this time.

Ex. "B" at 4

The seriousness of this case, counsel should have promptly obtain a expert to examine evidence and counter any expert by the government. Thus, said expert would have petitioner's blood, hair and semen, etc. tested for the defense. It is not known why counsel fail to pursue this point of the case.

14.

13. *The Ex. "15", dated February 24, 1'34 were completed before the Status Hearing, as stated above, the government was misleading, and researching, that it had blood, surgical swabs, and hair that link petitioner to crimes related to (D.M.), when he did not. The report indicates (D.M.) blood type is "A", a "secreter", and petitioner's blood type is "B" a "nonsecreter".*

14. On pages 4 the report it stated, "Semen was identified in stains on (12 figure, Ex "5"), testing of the semen showed the presence of blood type "A." *Washington v. Murray*, 952 Fed 1472 (4th Cir. 1991). According to counsel, he received these F.B.I. reports on 4 March 7, 1'34, two days before the Status Hearing, which counsel should have had a defense expert to examine the evidence. Ex "5" becomes petitioner in a head hair found on (M. Further, section (III) did not question petitioner's innocence. He stated "I think it's number 3." Petitioner argues this — actually innocent of these crimes of (D.M.), therefore, if the conviction stands, would continue to be a fundamental miscarriage of justice. See *Eagle v. Isaac* 456 U.S. 107, 71 S. Ed 2d 783, 105 S. Ct 1338 (1'82); *Curran, supra* 477 U.S. at 496; *Sawyer v. Whit* ___ U.S. ___, 156 S. Ct 2514, 165 S. Ed 1 (2010).

15.

13. At the plea hearing on Friday May 14, 1931, about two and a half months after the Status Hearing on March 9, 1994. After the government revised the plea agreement, the court asked the government what would be your evidence had this matter gone to trial, referring to victim (CDI), count 33. The [Hall] stated, in-part:

" . . . Your Honor, that he was able to subdue Ms. McKenzie by hitting her and grabbing her and was able to force her onto the couch located in her home, and while he had her there on that couch, he proceeded to force her to have sexual intercourse with him, both vaginal and oral, intercourse, and also sodomy."

Plea Hearing Transcript, pg. 33 Exs "A," "B", and "B3" do not support ___ the overreaching and misleading by the government. If the alleged conduct took place as the government alleges, there should be some sort of trace evidence, i.e. semen or hair (public). The government contradicted itself from what was

16.

stated in the Status Review on March 7, 1934. Under a
rape case, the government must prove penetration
of the female organ by sexual organ of a male.
*United States v. Bryant*, 420 F.2d 1327 (D.C. 1969).
The evidence proffered, and Exs. "#", "#2," and "555" do
not support such text when Petitioner guilt plea
to count 33 under false pretends that rendered the
guilt plea not knowingly and intelligently entered which
he received *Eldridge v. United States*, 618 F.2d
637 (D.C. 1972). Counsel, the Interm, also made of
petitioner, allowed the injust, wrongful conduct by
the government violated *Powell v. Alabama*, 387
U.S. 45, 53 S.Ct. 56, 77 L.Ed 158 (1972) ("Left
without the aid of counsel he may be put on trial
action charge, and convicted upon incompetent
evidence irrelevant to the issue or otherwise,
inadmissible." *Strickland, supra*, 446 U.S. at 658
And petitioner tries as the researchin and misleading
actions, he would not have plead guilt. *Hill v.
Lockhart*, 474 U.S. 52, 106 S.Ct 366, 88 L.Ed
2d 203 (1985); see also *Sochard v. Futwell*,
___ U.S. ___, 113 S.Ct 838, 122 L.Ed 2d 180;
*United States v. Slaules*, 73 F.3d 1314
(D.C. 1995)

17.

Issue 3: Petitioner Is Actually Innocent
Of The Crimes Related To Victim
Virginia W. Fair (VWF)

16. See Ex. "A", report dated March 23, 1984
shows a list of all tests that were conducted. The
victim reports (VWF) blood type is "A", and she is
a "secretor", same as (VWF). Semen identified
on specimens #5 though #8 and #10. Such
disclosed the presence of "A" blood group. The
hospital report thereto intact vaginal
penetration "unknown". The test was completed
on March 23, 1984, 14 days after the Status Hearing,
it appear the government was trying to predict
the future that all hed vaginal swabs, blood,
and hair upon these report clearly do not link
petitioner to the crime. Washington v. Harvey,
952 F2d 1412 (7th Cir 1991)

17. Furthermore, on page 5, the report indicates
tests is possible, and items will be held
for 45 days, or not picked up would be
returned. Petitioner and counsel was entitled
to any results of tested evidence, and should
have been appprise what evidence was being tested.

14.

from the government. See *Lopez v. Aguman*, 71 F.3d 673 (8 Cir 1996); *District of Columbia v. Jackson*, 261 A2d 511 (N.C. 1970). The undisclosed test results could also prove that petitioner is innocent of the charge. *Thomas v. Goldsmith*, 979 F.2d 746 (9th Cir 1992)

15. As determined by the FBI lab report Ex. "K3" that Petitioner blood-type is "B", P&M 2-1 a "nonsecretor" Victim (VSB) is blood-type "A" P&M 2-1, a "secretor" test conducted on certain item produced the "A" blood group. In one case *House vs. Bell* ___ U.S. ___, 126 S.Ct 2064, 165 L.Ed 2d 1 (2006) is very similar to petitioner case when three different blood type are involve between two individuals.

"Regarding the semen, FBI Special Agent Paul Bigbee, a serologist, testified that the source was a "secretor" meaning someone who "secretes the ABO blood group substance in their body fluids

19.

such as semen and saliva "a characteristic shared by 80 percent of the population, including House. Agent Bigbee further testified that the source of semen on the gown was blood type "H," House's own blood type. As to the semen on the panties, Agent Bigbee found only the "H" blood group substance, which "A" and "B" blood type secretors secrete along with substance "A" and "B," which "O" type secretors secrete exclusively. Agent Bigbee explained, however, —using science an amicus here sharply disputes, (sic) — that House's "H" antigens could have "degraded" into "H" (sic) Agent Bigbee thus concluded that both semen deposits would have come from House, though he acknowledged that the "H" antigen would have come from Mrs. Muncey herself if she was a secretor —something he "was not able to determine (sic) and that while Mr. Muncey was himself blood type "H" (as was his wife). Agent Bigbee was again "not able to determine his secretor status. [em. added]

20.

19. Petitioner is not a serologist, from the best understanding on this issue. It have been determined that victim (VM1) is blood-type "H," and she is a "secretor" Ex A. in the House case,. & Agent Bieber found only the "H" blood-group substance which "A" and "B" blood-type secretors secrete. Thus, it could have come from Mrs. Muncey if she was a secretor. [em added] —— The Muncey and her husband had blood type "A". Petitioner in this case could not have been the depositor of the "H" blood-type as stated in the FBI lab report, as blood-type "B" and a "nonsecretor."

20. Furthermore, in House Agent Bieber, on cross-examination that "a saliva sample" would have sufficed to determine whether Mrs. Muncey was a secretor." [em added] Victim (VM1) expert reports, the "K2" saliva sample was not examined inasmuch as the secretor status of the victim was determined through grouping tests conducted on "K1" blood sample.

21.

21. In a similar case, _Washington v. Murray_, 952 F.2d 1472 (4th Cir. 1991), he was charged and convicted for capital murder following the commission of rape. The court accepted the issue of ineffective assistance of counsel, respecting the failure to explore and use certain forensic evidence which allegedly was available to counsel and if used would have been directly exculpatory. -- Specifically, the petition alleged that his counsel had received but failed to appreciate the significance of, and hence to introduce at trial, the results of exculpatory laboratory tests, on semen stains found on a blanket received from the bed where the rape of Helen Williams occurred.

22. In this case, at the Status Hearing, counsel stated he had received (3) lab reports and more was coming. It have not been establish if and when he received the (3) lab reports after the Status Hearing. Nevertheless, he failed to appreciate the significance of the reports where the government stated it had blood and vaginal swabs before the hearing of (PN1) Dt 7s, exactly the report exonerates petitioner. The government maliciously manipulated the evidence when it knew it did not link petitioner to the crimes.

-22-

23. Further in _Washington_, the laboratory reports indicate _Washington_ blood - type as "O" with PGM type of 2-1 whereas four samples of semen stains on the blanket from the crime scene showed blood type "A" with PGM type of 1, was undisputed. The allegation that this disparity of - types indicated that _Washington_ could not have been the depositor of the semen in the stains was supported by the opinion by affidavit of a facially qualified expert that was not disputed by opposing expert opinion or other evidence -

24. See also _Massey v. Bell_, 112 F3d 50 (2d Cir 1447); _Massey_ (sic) referred repeatedly to the tests results, which he attached to his brief, as showing that "A" and "H" antigens were found in the semen on the underpants - He also twice encouraged the court to compare the report describing the antigens present in the underpants with the report describing the results of the blood test of the victim. _Massey_ showed that the antigens in the victim's saliva and the antigens in the semen

23.

slaine peator the victim, and not him.

35. McCray further made a similar claim as petitioner is making in this petition, that the government and/or prosecution engaged in misconduct by failing to make known the laboratory test results (sic) that were inconsistent with the results. - - (sic) McCray stated he was denied effective assistance of counsel because his counsel "had prior knowledge of the (sic) at these facts [the introduction of "false" evidence] and refused to make them known to the Court. McCray's claims against the prosecution may be meritless, but this connection was a reasonable attempt by a pro se litigant to focus the court's attention on precisely the claim he is now making in federal court. This is especially clear when the connection is read in the light of what followed in McCray's brief, his argument that the blood test results showed, that the semen stain did not "match" McCray and did "match" the boy, and the lab reports, which McCray attacked. Id. The same is raised in this case.

24.

36. See e.g. *Sims v. Livesay*, 970 F2d 1575 (6th Cir 1992), *Sims* claims he was denied effective assistance of counsel, he contended that it was Mr Interst's duty to obtain the services of a forensic expert to examine the quilt, its bullet holes, and its powder burns, and the fatal bullet for traces of fabric from the quilt. The petitioner claimed that these pieces as evidence would have established that the quilt was between Mike Smith and the pistol when the fatal shot was fired. The powder burns on the quilt, he alleged, account for the clean around on Mike Smith shirt, and thus undermine the states contention that Mr. Smith must have been shot from a distance. The court dismissed the petition.

37. In taken up, in the Memorandum Opinion accompanying its May 1991 Order granting the writ, the District Court assessed Mr. Interst's representation in light of the two-part test for ineffectiveness set out in *Strickland v. Washington*, 466 U.S. 608, 80 L.Ed.2d 674, 104 S.Ct 2052 (1984)

25.

The District Court agreed that Mr. McIntosh had an affirmative duty to have the physical evidence in [this] case examined to determine whether or not it supported his client's testimony and to introduce that evidence which offered a plausible explanation for the most damaging elements of the state's case.

25. The State appealed. The Appeal Court stated: "Although defense counsel might not have been told about the quilt by Sims, prior to trial McIntosh was in possession of an FBI report that should have alerted him to the significance of the quilt for the defense. After the shooting, the state delivered the quilt to the FBI for examination. The FBI microscopically examined and chemically processed the area around the bullet holes in the quilt. The report stated that the tests revealed gunpowder residue on the quilt. Such report cannot be ignored. (sic) The FBI report, however, disclosed facts that suggested that the state's case easily refutable. -- The FBI report presented the defense with a theory of the case that squared fully with Sims version of events. Id

26.

Issue 4   The Government's Misrepresentation Of Evidence Related To Victim Harriet Bell (HV) Was Induce To Obtain A Guilty Plea To Counts 2 & Violated Petitioner's Right To A Trial.

29. The Ex. "M(" report dated January 26, 1984 shows a list of items that were allegedly were tested. On page 3 of the report, it state:

"Three dark brown Negroid pubic hairs were found on Q1 (sheet) these three hairs exhibits the same microscopic characteristics as the pubic hair sample from Etheridge, therefore, he can be considered a source of these three hairs. It is pointed out that hair comparisons do not constitute a basis for absolute personal identification."

Pubic or other hairs do not prove rape. United States v. Bryant, 420 F2d 1327 (D.C. 1969).

51.

the hospital report attached thereto, list all tests that were done, sinnels, vaginal penetration, "unknown". Other tests are marked having been tested, i.e. semen, sperm, etc., this report is dated November 5, 1983, and the FBI lab report was completed about two months thereafter.

32. At the March 9, 1984 Status Hearing, Ex "B", the government proffered to the court that it would introduce at trial evidence of, "vaginal swabs and blood" that would link petitioner to the crime for count 24, when in fact the FBI lab report Ex "D" do not support this. The government statement was inaccurate and misleading. Petitioner and counsel relied on the representation of the government at the hearing and the implied representation of the government at the plea hearing in evaluating the strength of the government's case. Due to the misleading of evidence, i.e. vaginal swabs, and blood unsupported by the FBI lab report, petitioner guilty plea to that count, 24 was not knowingly and intelligently entered. Eldridge vs United State, 618 Fed 690 (D.C. 1980).

28.

31. It is fundamental to due process that a defendant who waives constitutional rights in entering a plea of guilty must do so voluntarily, knowingly, and intelligently. Edwards, 615 A.2d at 695. It cannot be voluntarily, knowingly or intelligently when relying on false presentation of evidence by the government relating to count 34. Such contradiction by the government misled petitioner and counsel to plea guilty to count 34, therefore, the prejudice petitioner suffers, is being denied a trial based on the truth of evidence. The guilty plea to count 34 should be vacated.

32. The Court of Appeals, held in Bruce v United States, 617 A.2d 406 (N.C. 1473) that [A] conviction obtained through the use of false evidence, known to be false by the government, denies a defendant liberty without due process of law. citing Agler v United States, 406 U.S. 150, 93 S.Ct. 763, 31 L.Ed.2d 104 (1970); 2 Lagios v Illinois, 360 U.S. 264, 19 S.Ct. 1173, 3 L.Ed.2d 1311 (1959); Mooney v Holohan, 394 U.S. 103, ___ S.Ct. ___, 79 L.Ed. 791 (1935).

29.

In _Napue_, the Supreme Court said, (t)he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Id. at 269, 3 L.Ed.2d at 218

Issue 5: Only 5 Scientific Reports Prepared By the FBI To Date In Connection With The Case

33. Those FBI lab reports are:

The Julie McKenzie report, dated December 23, 1983, Ex. "K";

The Julie McKenzie report, dated February 24, 1984, Ex. "K2";

The Julie McKenzie report, dated April 20, 1984, Ex. "K3";

The Virginia McNair report, dated March 23, 1984, Ex. "L";

The Harriet Weil report, dated January 26, 1984, Ex. "M"

30.

34. Evidence that there existing results and reports were requested and made that were not delivered to trial counsel and petitioner includes:

1. The Gulin McKenzie report, dated April 20, 1984, Ex. "B3" reference a report sent to the government, No. 3 1114042 S. TK 44 dated January 26, 1988, that was sent by the FBI to the U.S. Attorney. That report is not included in the reports given the defense. (This is the same date as the Harriet Weil report, dated January 26, 1984) Ex. "W1," but the report numbers are different.

2. The Gulin McKenzie reports, "Exs. "B", "B2" and "B3" do not have a hospital report there, as oppose to the FBI lab reports of victims (BBV) Ex. "L", and (HW) Ex. "W1". If victim (BBV) was raped as charged by the government, it should be a hospital report that she was treated. This is another attempt by the government to mislead and manipulate the evidence to blind-side — the truth, not only from petitioner and the court as well.

31.

3. The Harriet Weil report, dated January 26, 1984, Ex. "91", shows that blood and saliva samples were taken and that oral, and anal, vaginal swabs of complainant were made and were submitted to the FBI for analysis. The results of these tests have not been provided to petitioner and/or counsel.

4. The Harriet Weil report, dated January 26, 1984, Ex. "91", states that "other requested examination are continuing. You will be advised of those results and the disposition of the submitted items by a separate report." Such reports still have not been provided to petitioner.

5. At the Status Hearing on March 9, 1984, the government agreed with the court, the usual expert witness. Ex. "B", pg. 4, 96 summary report are not provided to petitioner. United States v. Jackson, 51 F.3d 646 (7th Cir 1995).

32.

6. As Ex. "H", at the evidentiary hearing, 416 Tatem claimed he advised petitioner of all FBI lab reports and other reports from the government. at pgs. 157-158, & Cite State v. Streater; 70 F3d 1314 (4th Cir. 1995)

34. In Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed. 2d 808 (1995), the Supreme Court held that a petitioner can obtain review of procedurally defaulted claims if he produces reliable new evidence not available at trial which demonstrates that it is more likely than not, that this evidence no reasonable juror would have convicted him. 513 U.S. at 326-28. For this type of situation the Court decided to adopt the S standard in Murray v. Carrier, 477 U.S. 478, 106 S. Ct. 2639, 91 L.Ed. 2d 397 (1986).

35. In order for petitioner to pass through the actual innocence gateway as Schlup did, petitioner must support his claim of innocence with reliable new evidence, whether exculpatory scientific evidence,

33.

trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial. _Schlup_, at 328-29, 115 S.Ct at 865. The evidence listed above can be considered as "new", the court, counsel (trial) and (post-conviction), including petitioner have no knowledge of the test results regarding the named victim, and was unable to compare that evidence to the FBI lab reports results. To allow this case to remain in the "darkness of miscarriage of justice" violates petitioner's due process right, and her right to effective assistance of counsel. This undisclosed evidence by the government can further support petitioner's claim of actual innocent.

36. It can fairly be said in this case that the constitutional errors have resulted in the convictions of one who is actually innocent of the crimes. _Carier, supra._ 477 U.S. at 496 The government should be required to _ produce the the evidence that was not produced or to produce all evidence to be tested by the defense. This can possibly change the outcome of a trial. Id.

34.

Issue 5. Petitioner Request For A Hearing For The Government To Produce Any Evidence Not Provided To Petitioner So Tests Can Be Conducted

37. This court can take a page out of _Thomas vs. Goldsmith_, 979 F.2d 746 (9th Cir 1996). "In order for _Thomas_ to overcome the procedural bar by means of the miscarriage of justice exception, he must supplement his claim with a "colorable showing of factual innocence." _McCleskey v. Zant_, — U.S. —, 113 L.Ed 2d 517, 111 S.Ct. 1454 (1991); _Kuhlmann v. Wilson_, 477 U.S. 436, 454, 91 L.Ed 2d 364, 106 S.Ct 2616 (1986) "A semen sample, or tests thereof, might enable him to make such a showing. However, if _Thomas_ must make a colorable showing of innocence before the district court may order a full evidentiary hearing on his defaulted claims. _Thomas_ is in something of a Catch-22. The samples, if it exists, is under the control of the state, and _Thomas_ would appear to have no way to

35.

have it tested unless, the federal courts intervene. But in order to make this, showing which would justify federal court intervention, _Thomas_ seeks the semen. _Id._ The court determined _Thomas_ was entitled to the semen sample. _Id._ See also _Toney v. Gammon_, 79 F.3d 693, 700 (8th Cir 1996)("Claims he has not been able to obtain the samples from the State in order to perform any kind of testing – blood typing – or DNA fingerprinting.") _Id._

35. See _Arbsecralt vs. Winn County Dis. Att. Off._ 171 F. Supp. 2d 366 (5rd Cir 2001)("court ordered seminal residue be tested by DNA"); _Hause vs. Bell_, — U.S. —, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006). _Banks v. United States_, 920 F. Supp. 688, 691 (E.D.Va. 1996).

_Id._ _____

As Ex. "D", ¶3 ¶ n.5 the Court in _Eldridge, II_ stated a case of "masked", the victims blood was present, the court did not point to which victim. Petitioners blood could not have been present in order for any such masking to any of the alleged

36.

The Maryland Court of Appeal in _Blake vs. State of Maryland_ #18123077-08 (2006), Raker, J. held, "prisoner seeking post-conviction testing of DNA evidence has a right to notice and a hearing on prosecutor's claim that the State no longer possesses testable DNA". See also _Thompson vs. State of Maryland_ #13409133-36, Opinion by Raker, J. (2006). But see _State vs. Smith_, No. SC 12309 (2006) ("A DNA report revealing that the only sample of semen recovered from a rape victim came from someone other than the defendant is relevant to a misidentification defense and is admissible into evidence".) [em added] See also _Osborne v. District Attorney's Office_, 445 F. Supp. 2d 1079 (citing Herrera, at 1081 n.12 (N.H. 2006)

36.1 cont. _____

crimes, nor was any presence of semen, belonging to petitioner was present. Only, alleged hair, it does not constitute absolute identification. Ex. "M" Thanks, do not prove rape.

33

## Conclusion:

Petitioner have made substantial claims that; (1) he is actual innocent of the crimes; (2) his counsel was clearly ineffective for failure to seek expert witness for the defense; (3) failure to advised petitioner of all the evidence the government had; (4) the government overreaching and misleading evidence it claim it had for counts 34 and 33 just to induce a plea of guilty; (5) the plea of guilty to counts 33 and 34 were not knowingly and intelligently enter from relying on ghost evidence by the government; (6) police officer did not have consent or a search warrant to conduct a search of petitioner's basement / room if occured.

Petitioner request for a evidentiary hearing. e.g. _Townsend v. Sain_, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)

Respectfully submitted,

Clinton C. Eldridge

.38

## Certificate of Service

Petitioner, Clinton Y. Eldridge, hereby and certify that he mailed his petition to the Clerk of the Superior Court of the District of Columbia, 500 Indiana Avenue, N.W., Washington, D.C. 20001 on this 20th day of February, 2007.

Respectfully submitted

Clinton Y. Eldridge
#00595-000
P.O. 8500
Florence, CO 81225

Criminal Division - Felony Branch

United States of America

J Shuker v.

Clinton T. Eldridge

6X A

Case No: F-663883

2-28-84
SH
J. Shuker

## Motion for Discovery

Defendant, Clinton T. Eldridge, Pro Se, respectfully moves this Court pursuant to the provisions of Sup. Ct. Rule 16 and 16-II to enter an order directing the government to permit defendant or defendant's counsel to inspect, copy or obtain the following information below:

(1) Any and all results and reports of scientific tests or analysis by or at this request of the government in connecation with the investigation and/or trial preparation of this case, including, but not limited to fingerprint comparisons, and any and all photographs of the defendant in this case.

(2) The names and addresses of all witnesses the alleged offense whom the government intends to call at the trial of this case. In the alternative, counsel for the defense requests an opportunity to such witnesses in private, at a location mutually _____ at the defense _____ without knowing the names or addresses of such witnesses if the presence of the witnesses is arranged by the government.

FILED
- APR 3 0 20__
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

(3) Any and all information within the posession of the government, or which may subsequently come to the attention of the government, which could constitute exculpat____

(4) And and all information pertaining to the police records in the cases of multiple evidence, that which is admissible for a specific purpose to which it should be handed down to the defendant and counsel to inspect the copys of such evidence for a fair trial.

(1) P.D. 668

(2) P.D. 81

(3) P.D. 163

(4) P.D. 251

The information requested above is necessary to the preparation of the defense of this case.

WHEREFORE, the defendant respectfully requests that the motion be granted and an appropriate order directing discovery be issued.

Respectfully submitted

Clinton C. Eldridge
C.C.E.

I, Clinton C. Eldridge, defendant herein, certify that a copy of the foregoing Motion for Discovery in Support there to was served by United States Marshalls on the Assistant United States Attorney, at his office, Building A, Superior Court of the District of Columbia, Washington, D.C. 20001 on th

Clinton C. Eldridge

Exibit "C"

the open door of a truck containing a gas stove stolen from the burgled premises. The suspect who was wearing gloves told the arresting officer that police would not find his fingerprints on anything. In reversing his conviction, we cited as controlling precedent such cases as *Quarles v. United States,* 308 A.2d 773, 774 (D.C. 1973), and *Corbin v. United States,* 237 A.2d 466, 467 (D.C.1968), and contrasted them with *Montgomery v. United States,* 384 A.2d 655, 660 (D.C.1978), where conviction as an aider and abettor to a shoplifting larceny was upheld because evidence that defendant kept gazing around the shop while his companion was reaching for and stowing away merchandise indicated that he was acting as a lookout.

On this record, we think it by no means clear beyond a reasonable doubt that appellant's greeting to a former school mate which on its face appeared to be a jovial quip was intended to set up Grooms as a target for robbery, even though appellant's codefendants might not have noticed the tempting necklace had not appellant's remark drawn attention to it. Granted that if Acker had indeed observed the robbery (as Grooms apparently assumed), he did nothing to frustrate it, but we know of no case—and the government cites none—which imposes a duty of rescue upon an inadvertent witness to a crime, particularly when one of the criminals was apparently carrying a handgun. Nor does the evidence here indicate that appellant facilitated the getaway of the culprits. The car they entered in departing the scene was possessed and driven by Cole, not Acker.

We recognize, of course, the well-established rule that when a conviction is challenged on the ground of insufficient evidence, the record must be viewed in the light most favorable to the evidence presented by the government; *e.g., Rose v. United States,* 535 A.2d 849, 850 (D.C. 1987). Nevertheless, we are unable to conclude that on the testimony against appellant Acker, a reasonable jury could find beyond a reasonable doubt that this particular defendant was guilty of robbery, either as a participant or an aider or abettor. Accordingly, the denial of the acquittal motion was error.[1]

*Reversed.*



**Clinton T. ELDRIDGE, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 88–CF–775, 90–CF–140 and 90–CF–1328.**

District of Columbia Court of Appeals.

Argued Feb. 25, 1992.

Decided Dec. 30, 1992.

The Superior Court, Eugene N. Hamilton, J., denied defendant's motion to withdraw his guilty plea and to vacate his sentence, and defendant appealed. The Court of Appeals, Ferren, J., held that: (1) defendant did not knowingly and intelligently plead to additional ninth count of revised plea package; (2) defendant was prejudiced by trial court's inadequate inquiry into voluntariness of plea to additional ninth count; and (3) trial court's allowing defense counsel to testify during postsentencing hearing regarding various confessions defendant made to him was permissible.

Affirmed in part; reversed in part and remanded.

Schwelb, J., filed dissenting opinion.

**1. Criminal Law ⬅1181.5(3)**

Fact that defendant pled guilty to revised plea package, containing nine, instead of eight, charges, arrived at in hasty discussion between prosecutor and defense

1. Appellant also argues that the failure to file a pre-trial motion for severance shows ineffective representation by his defense counsel. In view of our disposition, we find it unnecessary to reach this contention.

**EXHIBIT F**

*Ex "B"*

SUPERIOR COURT OF THE DISTRICT OF COLUMB.

CRIMINAL DIVISION

- - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

              v.                  :        Criminal Action Number:

CLINTON F. ELDRIDGE,              :              F-6638-83

              Defendant.          :

- - - - - - - - - - - - - x

Washington, D. C.
Friday, March 9, 1984

        The above-entitled action came on for a Status
Hearing before the Honorable ROBERT A. SHUKER, Associate
Judge, in Courtroom Number 23, commencing at approximately
9:48 a.m.

        THIS TRANSCRIPT REPRESENTS THE PRODUCT
        OF AN OFFICIAL REPORTER, ENGAGED BY
        THE COURT, WHO HAS PERSONALLY CERTIFIED
        THAT IT REPRESENTS HIS ORIGINAL NOTES
        AND RECORDS OF TESTIMONY AND PROCEEDINGS
        OF THE CASE AS RECORDED.

        APPEARANCES:

        On behalf of the Government:

        CHARLES HALL, Esquire
        Assistant United States Attorney

        On behalf of the Defendant:

        JAMES H. TATEM, Esquire
        Washington, D. C.

MR. LYNDON L. RUST
Official Court Reporter                    Telephone:    879-1042

FORM SEL-711  REPORTERS PAPER & MFG. CO.  800-626-6313

P R O C E E D I N G S

THE DEPUTY CLERK:  Case of United States versus

Clinton Eldridge, Case Number F-6638-83.

THE COURT:  Counsel identify themselves for record,

please.

MR. HALL:  Charles Hall for the Government.

MR. TATEM:  James H. Tatem for Mr. Eldridge.

THE COURT:  And Mr. Eldridge is here.

This matter is set for status hearing.  Has dis-

covery been completed?

MR. TATEM:  No, Your Honor.

THE COURT:  Why not?

MR. TATEM:  There are some items the Government

has to get.  I would ask to see the pictures.  Some of them

were given to me this morning.  There are some reports re-

garding scientific evidence; I was given three of them this

morning.  I understand there is more coming.

THE COURT:  When did you first have a meeting

with Mr. Hall about discovery in this case?

MR. TATEM:  When did we meet?

MR. HALL:  On March 7th.

THE COURT:  Wednesday.

MR. TATEM:  Yes.  I was in trial, Your Honor.

THE COURT:  What's been offered by way of a plea

bargain?

2

1    MR. HALL: Your Honor, we have made a, an offer

2  of armed rape, two counts of 3-1, which is burglary one,

3  two counts of robbery, two counts for which we would dismiss

4  the rest of the indictment.

5        THE COURT: There are no motions pending?

6        MR. TATEM: No, Your Honor.

7        THE COURT: What's the nature of the discovery

8  of the identifications in this case?

9        MR. HALL: Lineup identification, Your Honor,

10  and I think there was also some photograph identification.

11        THE COURT: Any statements made by Mr. Eldridge

12  that you seek to use in your case in chief that were made

13  to police officers while in custody?

14        MR. HALL: Your Honor, I have given counsel a

15  written statement that was made by Mr. Eldridge. If I dis-

16  cover others, I will so notify counsel as soon as I receive

17  notification of them.

18        MR. TATEM: I was given a copy of that statement.

19        THE COURT: How many witnesses do you expect to

20  call in your case, Mr. Hall?

21        MR. HALL: Your Honor, I would expect that there

22  would be between somewhere around 30 to 40.

23        THE COURT: What physical evidence do you foresee?

24        MR. HALL: Your Honor, we have clothing. Also

25  a ring, and vaginal swabs, blood, hair, photographs. And

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

3

1    at this time, Your Honor, that's the extent as far as I

2    know.

3              THE COURT:  The usual experts in line therewith?

4          MR. HALL:  That's correct, Your Honor.

5              THE COURT:  How many witnesses are anticipated

6    for the defense?

7          MR. TATEM:  Your Honor, three at this time.

8          THE COURT:  Any physical evidence that you foresee?

9          MR. TATEM:  No, Your Honor.

10         THE COURT:  Any expert or scientific testimony?

11         MR. TATEM:  None at this time.

12             THE COURT:  Are there any prior convictions of

13   Mr. Eldridge that the Government would seek to impeach him

14   with should he testify?

15             MR. HALL:  Yes, Your Honor.  I believe he has

16   a prior conviction for larceny.  Counsel can correct me

17   if he believes I'm wrong, but I believe he has one for a

18   1981 conviction for larceny, grand larceny.

19             THE COURT:  As in all cases, I will conduct the

20   voir dire.  Therefore, if there are any questions you want

21   me to consider, they must be submitted in writing three

22   days before trial or else I won't consider them.  The same

23   would be true of any nonstandard anticipated jury instruc-

24   tions.

25             As far as a trial date is concerned, how is May 14th?

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

1        MR. TATEM:  Fine.

2        THE COURT:  Mr. Hall?

3        MR. HALL:  That's agreeable, Your Honor.

4        THE COURT:  All right, that shall be the trial

5    date.

6        MR. HALL:  Your Honor, I have a request to make.

7    The FBI tells me in one of their reports that the head hair

8    sample that they received for Mr. Eldridge was in fact cut

9    off too short and, therefore, I would like to have the Court's

10   permission to submit in chambers to the Court another proposed

11   hair order for Mr. Eldridge to give another head hair sample.

12       THE COURT:  Mr. Tatem.

13       MR. TATEM:  We will not object.

14       THE COURT:  All right.

15       Mr. Eldridge, I will be signing an order for you

16   to submit another sample of your head hair and you must

17   comply with that order.  Do you understand that, sir?

18       THE DEFENDANT:  Yes, sir.

19       THE COURT:  All right.  Thank you very much.

20       Thank you, counsel.

21       [Thereupon, at approximately 9:54 a.m.,

22       the proceedings concluded.]

23                    - o -

24

25

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

1

## CERTIFICATE OF REPORTER

2

3

4        I, Lyndon L. Rust, an Official Court Reporter for

5    the Superior Court of the District of Columbia, do hereby

6    certify that I reported, by machine shorthand, in my official

7    capacity, the proceedings had and/or testimony adduced upon

8    the status hearing in the case of United States of America v.

9    CLINTON F. ELDRIDGE, Criminal Action No. F-6638-83, in said

10   court, on the 9th day of March, 1984.

11       I further certify that the foregoing 5 pages

12   constitute the official transcript of said proceedings as

13   taken from my machine shorthand notes, together with the

14   backup tape of said proceedings.

15       In witness whereof, I have hereto subscribed my

16   name this _2nd_ day of November, 1989.

17

18                                    _Lyndon L. Rust_
                                       Official Court Reporter

19

20

21

22

23

24

25

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

ELDRIDGE v. U.S.                 D.C.  **691**
Cite as 618 A.2d 690 (D.C.App. 1992)

counsel at plea hearing and inadequately communicated to defendant, prompted Court of Appeals to suggest remedy that would alleviate prejudice of manifest injustice, afford due process to defendant and at same time give government option of conserving both prosecutorial and judicial resources; Court of Appeals would allow government to petition court to vacate defendant's conviction on additional ninth count and defendant's convictions on remaining eight counts would stand or would allow defendant's guilty pleas to be withdrawn and his convictions and sentence on all nine counts vacated.

**2. Criminal Law ⬤=274(6)**

Defendant who entered guilty pleas was not entitled to have matter reopened on his competency to enter guilty pleas while on 100 milligrams of drug prescribed by his physician, where defendant failed to call physician to testify at hearing and trial court had benefit of physician's written report.

**3. Witnesses ⬤=219(3)**

Trial court's allowing defense counsel, over defendant's objections, to testify at postsentencing hearing regarding various confessions defendant made to him was permissible; part of defendant's argument at hearing was based on defense counsel's alleged ineffectiveness and therefore, defendant had implicitly waived his attorney-client privilege and defense counsel's testimony merely rebutted defendant's allegations concerning their attorney-client relationship.

**4. Criminal Law ⬤=998(7)**

To prevail on postsentence motion either to withdraw guilty plea or vacate sentence, defendant must show that he suffered manifest injustice and that trial court's refusal to grant his motion was abuse of discretion. Criminal Rule 32(e); D.C.Code 1981, § 23–110.

**5. Criminal Law ⬤=1134(1)**

Given gravity of constitutional rights that are waived when defendant pleads guilty, Court of Appeals will rigorously scrutinize trial court proceedings at which

defendant enters plea and later seeks to withdraw it.

**6. Constitutional Law ⬤=265.5**

It is fundamental to due process that defendant who waives constitutional rights in entering guilty plea must do so voluntarily, knowingly, and intelligently. U.S.C.A. Const.Amends. 5, 14.

**7. Criminal Law ⬤=273.1(4)**

One of direct consequences of which defendant must be informed when entering plea is full range of possible punishment, including both mandatory minimum and maximum possible sentence to which defendant may be subjected as result of guilty plea. Criminal Rules 11, 11(c)(1).

**8. Criminal Law ⬤=273.1(4)**

Defendant did not intelligently and knowingly plead to additional ninth count of revised plea package; neither defense counsel nor trial court adequately informed defendant that under new plea package he was pleading guilty to nine counts, instead of original eight counts, and that additional ninth count carried with it additional mandatory prison term, thereby increasing overall mandatory minimum and maximum possible sentence for his crimes.

**9. Constitutional Law ⬤=265.5**
**Criminal Law ⬤=273.1(4)**

Given length and complexity of original eight-count plea offer and last minute revisions at end of plea hearing involving three significant changes in original plea bargain, arrived at in hasty discussion between prosecutor and defense counsel, court's colloquy with defendant where court informed defendant about substance of revisions, but never discussed effect of revisions on original plea package, court had outlined to defendant at beginning of hearing, was insufficient to fulfill requirements of applicable criminal rule and due process. Criminal Rule 11; U.S.C.A. Const.Amends. 5, 14.

**10. Criminal Law ⬤=273.1(4)**

Where plea package containing eight offenses was hastily revised at plea hearing to include additional ninth count, trial court should have advised defendant that

overall package had been changed to include nine rather than eight offenses and that additional offense would increase his possible punishment by 5 to 30 years; such advice was critical to correct prosecutor's misleading statement on record, unrebutted by defense counsel, that revisions to original plea offer were slight. Criminal Rule 11.

**11. Constitutional Law ⬅257**

Process due felony defendant who waives constitutional rights does not vary inversely in proportion to severity of charges.

**12. Criminal Law ⬅1167(5)**

Defendant was prejudiced by fact that he was not adequately informed that original plea package had been changed to include nine rather than eight offenses and that additional offense would increase his possible punishment by 5 to 30 years; fact that defendant's total sentence for all nine counts amounted to less than statutory maximum allowable under original eight-count agreement did not remedy defects in plea proceeding.

**13. Criminal Law ⬅273.1(1)**

When defendant pled guilty to revised plea package containing nine offenses, instead of eight, defendant's rights were not violated, nor did he suffer prejudice, with regard to his guilty pleas to original eight counts in revised plea package; number and types of offenses and range of potential punishment with respect to these eight counts were same under revised plea as under original offer and defendant engaged in extensive colloquy with trial court in which he admitted committing several of charged offenses and recited numerous background facts and circumstances.

**14. Criminal Law ⬅1181.5(8)**

In cases where convictions on some but not all counts of multiple-count indictment are vacated on appeal, Court of Appeals may remand case to trial court for resentencing on remaining convictions, so as not to upset interdependent sentencing

structure; as long as total length of new sentence on remaining counts does not exceed total length of defendant's previous sentence on all counts, including those overturned, and there is no other evidence of any retaliatory motive, such resentencing offends neither due process nor double jeopardy clause. U.S.C.A. Const.Amends. 5, 14.

---

Stuart Fisk Johnson, appointed by this court, for appellant.

Clinton T. Eldridge, also filed a brief pro se.

Teresa A. Howie, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., Colleen M. Kennedy, and Charles L. Hall, Asst. U.S. Attys., were on the brief, for appellee.

Before FERREN and SCHWELB, Associate Judges, and MACK, Senior Judge.

FERREN, Associate Judge:

Appellant pleaded guilty to nine counts of a thirty-seven count indictment and was sentenced to prison for a total of 40 to 120 years.[1] He appeals from the trial court's order denying his motion to withdraw his guilty plea under Super.Ct.Crim.R. 32(e) and to vacate his sentence under D.C.Code § 23-110 (1989 Repl.). The primary issue on appeal is whether appellant understood the consequences of a revised plea package the prosecutor and defense counsel arranged during the plea hearing. This revised agreement resulted in appellant's pleading to an additional burglary count ("count 20"), increasing the overall plea package from eight counts (the original agreement) to nine counts. Because neither the trial court nor defense counsel informed appellant of the consequences of the revised plea bargain, i.e., that he was pleading to an additional burglary count that carried with it an additional possible prison sentence ranging from 5 to 30

---

1. Appellant pleaded guilty to four of the counts without admitting the acts of the crime, under

the doctrine of *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

**ELDRIDGE v. U.S.**    D. C.  **693**
Cite as 618 A.2d 690 (D.C.App. 1992)

years,[2] we conclude that appellant did not intelligently plead to—and thus did not intelligently waive his constitutional rights with respect to—count 20. Furthermore, because the trial court imposed a consecutive sentence of 5 to 15 years for count 20, we conclude that prejudice occurred resulting in manifest injustice. *See* Super.Ct.Crim.R. 32(e). However, we also conclude that appellant knowingly, voluntarily, and intelligently entered guilty pleas to the other eight counts.

[1–3] This rather unorthodox set of circumstances, flowing from the summary revision of a plea offer inadequately communicated to a defendant, prompts us to suggest a remedy that will alleviate the prejudice of manifest injustice, afford due process to appellant, and at the same time give the government the option of conserving both prosecutorial and judicial resources. We remand this case to the trial court with the following instructions. If the government wishes to petition the court to vacate appellant's conviction on count 20, it may do so and appellant's convictions on the remaining eight counts will stand. Otherwise, the court must allow withdrawal of appellant's guilty pleas and vacate his convictions and sentence on all nine counts.[3]

### I.

On January 25, 1984, the government filed a thirty-seven count indictment against appellant. The charges covered incidents that occurred on seven different dates in the fall of 1983. The alleged offenses included armed rape, sodomy, armed robbery, first and second degree burglaries, and related assault and destruction of property charges. At a March 1984 status hearing, the prosecutor first announced a plea offer. Once it became clear, however, that appellant did not want to plead guilty, the case remained scheduled for trial. On May 14, 1984—the day trial was set to begin—appellant's case was called for disposition. While everyone was waiting for the marshal to bring appellant into the courtroom, the prosecutor informed the court that appellant would plead guilty to eight counts of the indictment. Defense counsel affirmed that expectation. After appellant arrived, the court personally addressed appellant, going over each of the eight counts in the offer. Appellant agreed that the counts enumerated by the court constituted the plea bargain he was prepared to accept.

The court told appellant that he was not required to plead guilty to any of the counts and that he had an absolute right to trial by jury if he desired. The court asked appellant if he had any question about what the court had told him. Appellant said no. The court asked appellant if he understood the consequences of pleading guilty, and appellant replied yes. The court informed appellant that if the court accepted his pleas of guilty, it could impose the maximum sentences provided by law and that, in the case of rape, the maximum sentence was life imprisonment. Appellant replied that he understood. The court then stated the maximum/minimum sentence provided by law for each of the counts in

2. *See* D.C.Code § 22–1801(a) (1989 Repl.).

3. We affirm the trial court's Memorandum Order in all other respects and summarily decide appellant's other claims on appeal. Appellant argues that the trial court erred in denying his motion for a "limited retrospective hearing" on appellant's competency to enter his nine guilty pleas while on 100 milligrams of Mellaril prescribed by his physician, Dr. Cambosos. Because appellant failed to call Dr. Cambosos to testify at the hearing and because the trial court had the benefit of the doctor's written report, we cannot say the trial court abused its discretion in deciding not to reopen the matter. *See King v. United States*, 550 A.2d 348, 354 (D.C. 1988). Appellant also contends the trial court erred during the post-sentencing hearing when

it allowed appellant's defense counsel, over appellant's objections, to testify regarding various confessions appellant had made to him. Because part of appellant's argument at the hearing was based on defense counsel's alleged ineffectiveness, we agree with the trial court that appellant implicitly waived his attorney-client privilege. *See Doughty v. United States*, 574 A.2d 1342, 1343 (D.C.1990). We also note that defense counsel's testimony merely rebutted appellant's allegations concerning their attorney-client relationship. Finally, appellant's *pro se* claim that the motions judge was prejudiced against him merely because the judge also presided over appellant's civil trial, is unsupported by the record.

the plea agreement and informed appellant that sentences could be imposed concurrently or consecutively. The court then went through the specific allegations of each of the eight counts to which appellant was proffering a guilty plea. For each count, the court either engaged appellant in a brief colloquy about the underlying facts or, in the case of *Alford* pleas, *see supra* note 1, asked the government for a complete proffer of what it expected its evidence to be with respect to each offense if the matter were to go to trial. During this part of the hearing, appellant freely admitted to raping one of the complainants (alleged in count 6 of the indictment).

The plea hearing proceeded smoothly until the court reached the eighth and final count of the plea offer. When the court informed appellant of the underlying allegations of that count (count 33 of the indictment)—that he had carnal knowledge of Complainant "M" forcibly and against her will—appellant denied that he had committed the offense and stated that he had only entered Complainant M's home and robbed her. When the court asked appellant why he had indicated earlier that he wanted to plead guilty to count 33, he responded, "I didn't know it was that one." At that point, defense counsel asked for the court's indulgence and conversed with the prosecutor off the record for several minutes out of the earshot of both the court and appellant. Following the short discussion between counsel, the prosecutor informed the court of a revised plea offer:

[The Prosecutor]: Your Honor, in view of what has been said, the Government is revising [its] plea offer *slightly* [emphasis added].

[The Court]: Yes, sir.

[The prosecutor]: We now would expect Mr. Eldridge to enter a plea of guilty to count 24 of rape, and that would be a straight plea not under the doctrine of Alford, to the rape of [Complainant "W"] and of count 20, burglary in the first degree, with respect to the home of [Complainant W], and count 33, the lesser included charge of assault with intent to—assault with intent to commit rape on

[Complainant M], and that would be under the doctrine of Alford.

The court then restated the prosecutor's proposed revision and asked appellant if he desired to plead as the prosecutor had outlined. Appellant said yes. The court then took appellant through the allegations in each count of the plea revision; appellant admitted that he had committed first degree burglary (count 20) and forcible rape (count 24), and the government presented its expected evidence regarding assault with intent to commit rape under count 33, to which appellant pleaded under *Alford*. Finally, the court confirmed one more time that appellant understood the meaning of his bargain before accepting appellant's guilty pleas.

On July 19, 1984, the court sentenced appellant to consecutive prison terms which, when aggregated, amounted to 40 to 120 years. The aggregate sentence included 10 to 30 years on the count 24 rape charge and 5 to 15 years on the count 20 burglary charge.

After sentencing, appellant filed several *pro se* motions to reduce his sentence. Pertinent to this appeal, on October 17, 1984, appellant sent a letter to the court complaining that he had not understood the plea agreement. On January 31, 1985, appellant filed another motion in which he stated, among other things: "I don't understand what my plea was all about; it was never explained to me in full details." The filing which triggered the instant appeal, however, was appellant's June 10, 1985 *pro se* petition, which inventoried an abundance of alleged infirmities and injustices. After counsel was appointed, appellant filed a supplemental memorandum which characterized appellant's petition as a motion to vacate sentence under D.C.Code § 23–110 and to withdraw his guilty pleas under Super.Ct.Crim.R. 32(e). In particular, this memorandum focused on appellant's plea to count 20 and argued that it was "in error" because appellant did not intend to plead to nine counts rather than eight, as originally agreed. Following a lengthy evidentiary hearing, the trial court issued a 47-page Memorandum Order denying appellant's motion. The court concluded that

ELDRIDGE v. U.S.        D. C.   695
Cite as 618 A.2d 690 (D.C.App. 1992)

appellant had been competent during the plea hearing and that he had knowingly and voluntarily waived his rights and entered his guilty pleas to all nine counts.

II.

[4, 5]  In order to prevail on a post-sentence motion either to withdraw a guilty plea under Super.Ct.Crim.R. 32(e), or to vacate sentence under D.C.Code § 23–110, appellant must show that he suffered "manifest injustice," [4] and that the trial court's refusal to grant his motion was an abuse of discretion. *See Goodall v. United States,* 584 A.2d at 562 n. 5 (citing *McClurkin v. United States,* 472 A.2d 1348, 1352 (D.C.), *cert. denied,* 469 U.S. 838, 105 S.Ct. 136, 83 L.Ed.2d 76 (1984)).  Given the gravity of the constitutional rights that are waived when a defendant pleads guilty, however, this court will rigorously scrutinize the trial court proceedings at which the defendant enters the plea and later seeks to withdraw it. *See Gooding v. United States,* 529 A.2d at 304–05 & n. 4.

[6]  It is fundamental to due process that a defendant who waives constitutional rights in entering a plea of guilty must do so voluntarily, knowingly, and intelligently. *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969); *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969); *see Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).  "Overwhelming proof of a defendant's guilt proffered by the government does not overshadow the fundamental right of a defendant to choose between proceeding to trial or, in the alternative, making a voluntary and intelligent waiver of that

right and other rights pursuant to a plea agreement." *Goodall,* 584 A.2d at 563 (citing *Byrd v. United States,* 377 A.2d at 405).  The requirement that a guilty plea be knowing and intelligent is also implicit in Super.Ct.Crim.R. 11, *see Byrd,* 377 A.2d at 404, and underlies its specific directives to the trial judge.

[7]  "In order to plead intelligently, a defendant must know the direct consequences of a plea." *Goodall,* 584 A.2d at 563 (citing *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970)).  One of these direct consequences of which the defendant must be informed is "the full range of possible punishment," including both the mandatory minimum and the maximum possible sentence to which the defendant may be subjected as a result of a guilty plea. *Goodall,* 584 A.2d at 563; *see also Gaston v. United States,* 535 A.2d 893, 896 (D.C. 1988); Super.Ct.Crim.R. 11(c)(1).

[8]  In the present case, we conclude that appellant's waiver of his constitutional rights was not knowing and intelligent, because neither counsel nor the trial court adequately informed appellant that under the new plea package he was pleading guilty to an additional ninth count that carried with it an additional mandatory prison term and thereby increased the overall mandatory minimum and maximum possible sentence for his crimes.

The specific effect of the prosecutor's revised offer was to: (1) include a plea to rape of Complainant W under count 24 as a substitute for the rape charge under count 33 involving Complainant M that appellant had denied in his colloquy with the court; (2) reduce the plea under count 33 from

---

4.  In *Gooding v. United States,* 529 A.2d 301, 305–06 (D.C.1987), this court suggested that a non-technical Rule 11 defect that affects substantial rights is enough to warrant reversal, and that the "manifest injustice" standard applies only when a defendant attacks his or her plea on grounds other than Rule 11.  *See also Springs v. United States,* 614 A.2d 1 (D.C.1992).  More commonly, however, this court has simply applied the manifest injustice standard in determining whether a Rule 11 defect requires reversal in cases involving a post-sentence withdrawal motion.  *See Wilson v. United States,* 592 A.2d 1009, 1013 (D.C.) (per curiam), *cert. denied,* — U.S. —, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991); *Goodall v. United States,* 584 A.2d 560, 563 (D.C. 1990) (per curiam); *Holland v. United States,* 584 A.2d 13, 16 (D.C.1990); *Byrd v. United States,* 377 A.2d 400, 405 (D.C.1977); *Hicks v. United States,* 362 A.2d 111, 113 (D.C.1976) (per curiam).  We need not decide in this case whether there is any real difference between the two approaches, since the parties agree that the "manifest injustice" controls and we would come to the same decision regardless of which standard we apply.

**696** D. C.    **618 ATLANTIC REPORTER, 2d SERIES**

rape to an *Alford* plea to assault with intent to commit rape; and (3) add a new plea to burglary under count 20 of the indictment (involving another complainant), a plea which had not been part of the original bargain. Because appellant had already pleaded under *Alford* to count 24's lesser included offense of assault with intent to commit rape, the new agreement in effect "swapped" appellant's pleas to counts 24 and 33: appellant now pleaded to rape under count 24 and pleaded (per *Alford*) to assault with intent to commit rape under count 33, instead of vice-versa as in the original offer to which appellant had agreed. If that had been the extent of the plea revision, there would be no question that appellant voluntarily, knowingly, and intelligently pleaded guilty to the revised plea package, since the number and types of offenses and the range of potential punishment would have been the same as under the original offer. The prosecutor also added to the new package, however, a wholly separate count 20 requiring appellant to plead guilty to an additional charge of burglary, thereby increasing the total number of offenses from eight to nine and increasing appellant's potential sentence by 5 to 30 years. *See* D.C.Code § 22–1801(a) (first degree burglary). By adding this new felony offense to the package, the government made a substantial change in the plea offer; it was considerably more than the "slight" revision the prosecutor told the court he was proposing.

We agree with appellant that, as far as the record shows, defense counsel did not adequately inform appellant of the terms and consequences of the new package. Although the trial court's forty-seven page Memorandum Order denying appellant's motion to withdraw his plea carefully addresses each of appellant's other claims alleging deficiencies in the plea process and inadequacies of defense counsel, the Memorandum fails to state whether defense

counsel in fact informed appellant that a new burglary count had been added to the eight counts of the original plea package.[5] At the motion hearing defense counsel stated that he had just assumed appellant knew the package had been revised to include an additional count and, for that reason, had seen no need to inform appellant that an extra burglary count had been added; he relied on the fact that appellant had heard the prosecutor "recite" the revised plea agreement in open court. But as stated above, the prosecutor had said, incorrectly, that the plea offer revisions were "slight." Moreover, a review of defense counsel's hearing testimony shows that counsel himself may not have understood the plea offer revisions and their consequences. Defense counsel said he was "not sure" whether the revisions had resulted in appellant's exposure to a greater sentence. It also appears that counsel may have believed that the prosecutor simply substituted a burglary count because appellant had admitted burglarizing the home of Complainant M under count 33 at the same time he denied raping her. In fact, however, the prosecutor substituted both a separate rape count and a separate burglary count, involving Complainant W under counts 20 and 24, not count 33.

**[9, 10]** Similarly, we conclude that the trial court's Rule 11 inquiry was inadequate in light of the revised plea package. Although the trial court informed appellant about the substance of the revisions, asked the government for its expected evidence, and earlier in the proceeding had informed appellant about the mandatory minimum and maximum possible sentence for burglary (in reference to a different burglary count that was part of the original plea offer), the court never discussed the effect of the revisions on the overall plea package the court had outlined to appellant at the beginning of the hearing, when the plea

---

5. The trial court did credit defense counsel's hearing testimony that counsel did not object to the government's enhancement of the package from eight counts to nine "because *he* [defense counsel] was concerned that the government would otherwise discover offenses that the defendant had informed defense counsel of but

which the government had apparently not learned of." Memorandum Order at 46. That finding, however, begs the question of whether defense counsel actually informed appellant that an extra burglary count had been added and that the extra count carried with it potential for a greater sentence.

bargain had consisted of guilty pleas to eight rather than nine offenses. We believe that, given the length and complexity of the original eight-count plea offer, and further given the last minute revisions at the end of the plea hearing involving three significant changes in the original bargain—arrived at in a hasty discussion begin—between the prosecutor and defense counsel—the court's colloquy with appellant was insufficient to fulfill the requirements of Rule 11 and due process. We hold that Rule 11 required the court to advise appellant that the overall package had been changed to include nine rather than eight offenses, thereby increasing his possible punishment by 5 to 30 years for his proposed guilty plea to the additional burglary count.[6] Such advice from the court was especially critical in order to correct the prosecutor's misleading statement on the record—unrebutted by defense counsel—that the revisions to the original plea offer were "slight."[7] Hence, we cannot agree with the trial court that appellant intelligently pleaded guilty to count 20.

**[11, 12]** Before we can conclude that manifest injustice occurred, however, we must also determine whether appellant was prejudiced by these errors.[8] *Hicks,* 362 A.2d at 113. In this case, we conclude that appellant did suffer prejudice, insofar as the court relied on count 20 in sentencing him to a wholly unanticipated additional term of 5 to 15 years, to run consecutively to his sentences for the offenses covered by his eight other guilty pleas. The fact

that appellant's total sentence for all nine counts amounted to less than the statutory maximum allowable under the original eight-count agreement does not remedy the defects in his plea proceedings. "That a sentence imposed remains less than the maximum possible does not cure a trial court's error of accepting a plea when that plea is based upon manifestly incorrect information." *Goodall,* 584 A.2d at 563–64. Furthermore, notwithstanding the length of appellant's aggregate sentence on the other eight counts, we cannot say that the additional sentence on count 20 could not affect his opportunity for parole during his lifetime, given appellant's age (24) at the time of sentencing. Thus, we conclude that the additional sentence of 5 to 15 years did result in prejudice to appellant and, accordingly, that the trial court abused its discretion by not granting appellant's motion to withdraw his guilty plea. *See, e.g., Byrd,* 377 A.2d at 405 (where injustice manifest in the record, trial court clearly abused discretion when it denied appellant's post-sentence motion to withdraw guilty plea).

**[13]** At the same time, however, we conclude that the appellant's rights were not violated, nor did he suffer prejudice, with regard to his guilty pleas to the remaining eight counts in the revised plea package. As we noted above, there is no question that appellant voluntarily, knowingly, and intelligently pleaded guilty to these charges, because the number and

---

6. *Cf. Hicks,* 362 A.2d at 113 (holding in prison breach case that trial court should have made certain defendant understood that sentence imposed upon guilty plea was consecutive to sentence then being served).

7. Despite the prosecutor's misleading statement, based on the record we cannot agree with appellant that the prosecutor "breached his agreement" or acted with "vindictiveness." Although we agree with the government that, factually, the prosecutor would not have changed his original offer but for appellant's refusal to admit to rape under count 33, that does not change the constitutional requirement that all guilty pleas must be entered into intelligently with a full understanding of the consequences.

8. Super.Ct.Crim.R. 11(h), which became effective on September 1, 1985, provides: *"Harmless*

error. Any variance from the procedures required by this Rule which does not affect substantial rights shall be disregarded." Technically this amendment does not apply to our review of appellant's case, since his plea hearing took place on May 14, 1984, but even if it did this would not alter our decision, since we conclude that appellant suffered prejudice.

Our dissenting colleague appears to suggest that we should also consider the brutality of appellant's crimes in deciding whether manifest injustice occurred at the plea hearing. *See post* at p. 700 note 2 (SCHWELB, J., dissenting). We know of no authority for that proposition; the process due a felony defendant who waives constitutional rights does not vary inversely in proportion to the severity of the charges.

types of offenses and the range of potential punishment were the same as under the original offer. Furthermore, we agree with the trial court that during the plea proceeding appellant "was completely aware of all of the[ ] circumstances relating to his situation and to the status of the evidence[,] both the government's and his own, and it was because of those circumstances and that evidence, as the defendant said at the time of his pleas, that he entered his pleas of guilty." Memorandum Order at 43. There is no evidence to suggest that appellant was under the influence of any medication or substance during the plea hearing as to impair his ability to participate fully in the proceeding. Appellant engaged in an extensive colloquy with the trial court in which he admitted committing several of the charged offenses and recited numerous background facts and circumstances.

### III.

### A.

"Where the trial court's denial of a Rule 32(e) motion is an abuse of discretion, this court can reverse that decision, or it can order other relief determined to be appropriate." *Goodall*, 584 A.2d at 562 (footnote omitted). In fashioning an appropriate remedy in this case we bear in mind that appellant intelligently entered pleas to the other eight counts of the revised plea package. The errors of defense counsel and the trial court, as well as the misleading comment of the prosecutor in offering the revision, prejudiced appellant insofar as they failed to make it clear that count 20

was an addition to the original plea package that carried with it an additional mandatory prison term. We also note that it would likely be very difficult for the government to try this case now, over nine years after the date of appellant's admitted and alleged crimes. Thus we seek to create a remedy that will both safeguard appellant's constitutional rights, by protecting his understanding that he was pleading guilty to eight offenses, and conserve prosecutorial and judicial resources, by giving the government the opportunity to hold appellant to his guilty pleas on these eight counts.

With these considerations in mind, we remand this case to the trial court with the following instructions. If the government wishes to do so, it may petition the trial court to vacate appellant's conviction on count 20 and the corresponding 5 to 15 year term given to appellant on that count. In that event, appellant's convictions on the remaining eight counts shall stand.[9]

If the government does not file this petition to vacate appellant's conviction on count 20, then the trial court shall allow appellant to withdraw his guilty plea as to all nine counts and shall vacate his convictions and sentence thereon. In that case the government shall have the option of proceeding to a new trial.

### B.

If the government does petition to vacate appellant's conviction on count 20, the trial court shall not be limited to subtracting the 5 to 15 year term for Count 20 from appellant's sentence. Rather, the trial court may decide, at its discretion, whether to

---

9. Other courts have similarly allowed the government or the trial court to avoid restarting a case altogether by revising the plea bargain to conform to defendant's understanding of its terms. *See United States v. Young*, 932 F.2d 1035 (2d Cir.1991) (permitting guilty plea to stand as long as government foregoes restitution, where defendant was not told at plea allocution that restitution was a possible penalty); *United States v. Khan*, 869 F.2d 661 (2d Cir. 1989) (allowing deletion of restitution portion of sentence, without requiring vacation of guilty plea and reversal of conviction, in same circumstances), *cert. denied*, 498 U.S. 682, 111 S.Ct. 682, 112 L.Ed.2d 674 (1991); *Strader v. Garri-*

*son*, 611 F.2d 61 (4th Cir.1979) (giving state option of reducing prisoner's sentence on one count where prisoner was erroneously informed that guilty plea would not affect his parole eligibility date); *United States v. Lewis*, 875 F.2d 444 (5th Cir.) (approving district court's reduction of defendant's special parole term to six years, in accord with what court had told defendant at plea hearing), *cert. denied*, 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *United States v. Lott*, 630 F.Supp. 611 (E.D.Va.) (deleting improperly imposed restitution order from sentence, thereby reducing counsel's oversight to harmless error and avoiding retrial), *aff'd*, 795 F.2d 82 (4th Cir.1986).

vacate appellant's sentence entirely, and to resentence appellant on the remaining eight counts, so as to realize the intent of its original sentencing plan.

[14] In cases where convictions on some but not all counts of a multiple-count indictment are vacated on appeal, this court may remand the case to the trial court for resentencing on the remaining convictions, so as not to "upset an interdependent sentencing structure." *Bean v. United States,* 606 A.2d 770, 772 (D.C.1992) (quoting *Thorne v. United States,* 471 A.2d 247, 249 (D.C.1983)). As long as the total length of the new sentence on the remaining counts does not exceed the total length of appellant's previous sentence on all counts (including those overturned), and there is no other evidence of any retaliatory motive, such resentencing offends neither due process nor the double jeopardy clause. *See Pennsylvania v. Goldhammer,* 474 U.S. 28, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985) (per curiam); *United States v. Pimienta-Redondo,* 874 F.2d 9 (1st Cir.) (en banc), *cert. denied,* 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 185 (1989); *United States v. Hodges,* 628 F.2d 350 (5th Cir.1980). The rationale for this practice is that, in sentencing, the trial judge takes into account not only the number of actual convictions but also the defendant's conduct and character. As the United States Court of Appeals for the First Circuit observed in *Pimienta-Redondo:*

> Society has a strong interest in ensuring that, in our criminal jurisprudence, punishment "will suit not merely the individual defendant." ... The myriad of other factors underlying the original sentence in a multiple count case are not necessarily altered when a defendant successfully appeals his conviction on one count. After an appellate court unwraps the package and removes one or more charges from its confines, the sentencing judge, herself, is in the best position to assess the effect of the withdrawal and to redefine the package's size and

shape (if, indeed, redefinition seems appropriate).

874 F.2d at 14 (citations omitted) (quoting *Wasman v. United States,* 468 U.S. 559, 564 (1984)).[10]

We note that allowing for such resentencing is not inconsistent with our ruling requiring revision of the plea bargain to conform to appellant's expectations. On the basis of the plea hearing, appellant could have reasonably expected that he would be sentenced on eight convictions, not nine, but he had no basis for expecting that he would receive any particular sentence on those eight convictions, as long as it fell within the statutory guidelines.

Nor is there any inconsistency between our conclusion that appellant was prejudiced by the 5 to 15 year term he received on count 20 and the fact that appellant could conceivably (but not necessarily) be given the same aggregate sentence on the remaining eight counts. Appellant had a right to have the trial court sentence him only upon the eight counts to which he knowingly pled guilty. Accordingly, insofar as the trial court relied on nine counts, including count 20, in determining appellant's original sentence, there is at least a present implication that appellant's aggregate sentence would have been less if imposed on eight counts. Appellant, therefore, is at least prejudiced by the lack of opportunity thus far to receive sentence on only eight, not nine, counts.

*Affirmed in part, reversed in part, and remanded.*

SCHWELB, *Associate Judge,* dissenting:

As my colleagues in the majority acknowledge, Eldridge explicitly concedes in his brief that he is not entitled to prevail either on his motion to withdraw his plea, *see* Super Ct.Crim.R. 32(e), or on his motion to vacate sentence, *see* D.C.Code § 23–110 (1989), unless he is able to demonstrate manifest injustice. *Wilson v. United*

---

10. The cases on which we rely to permit revision, without withdrawal, of a plea agreement, *see supra* note 9, are not authority, in addition, for revision of the aggregate sentence for con-

victions under a multiple-count indictment. Those decisions revise the sentence, rather than remand for resentencing, because an aspect of the sentence—typically restitution—is illegal.

*States,* 592 A.2d 1009, 1013 (D.C.1991) (per curiam); *McClurkin v. United States,* 472 A.2d 1348, 1352 (D.C.1984). In my opinion, he has made no such showing.

My colleagues do not deny that Eldridge was duly advised of the offenses of which he would be found guilty under the terms of the revised plea agreement. It is likewise undisputed that he was told of the maximum sentence for each crime to which he was entering a plea, including the crime of burglary (which was the subject of the added charge). Eldridge also expressly admitted that he had committed the burglary which Count 20 addressed. The defect which my colleagues perceive in this proceeding is that Eldridge apparently was not explicitly advised that he was now pleading guilty to nine counts instead of eight, and that his exposure was increased accordingly.

It would no doubt have been preferable if the judge or trial counsel had specifically told Eldridge that the number of counts in the original plea package had been increased in the revised agreement. I cannot agree, however, that the apparent failure so to advise him resulted in manifest injustice. In fact, Eldridge was apparently being offered a pretty good deal, for a large majority of the charges against him were dismissed. His trial counsel apprehended that if his client rejected the revised plea offer, he might be convicted of all thirty-seven counts. The attorney was also concerned that the government might learn of still further rapes and burglaries. Imprisonment for the rest of Eldridge's life could thus become a virtual certainty, rather than a possibility.

The increase in Eldridge's potential sentencing exposure occasioned by the revised plea agreement was more theoretical than real. Under the original package, Eldridge was to plead guilty to two rape-related charges, each carrying a maximum sentence of life imprisonment, as well as to six other charges; considering all eight counts, he could have received sentences totalling fifty-five years to life. In other words, even before the ninth count was added, the judge could have kept Eldridge under lock and key for most of the remainder of his life. After Eldridge entered a plea to Count 20, all but nine of the thirty-seven counts were dismissed, and Eldridge's exposure was only marginally different under the revised plea agreement.[1] Moreover, the sentence imposed by the judge was substantially less than the maximum which he could have imposed under the original eight-count plea agreement.

Eldridge knowingly and voluntarily entered pleas of guilty to the commission of brutal, armed, and in most cases sex-related crimes against five different women.[2] It was he who initially failed to go through with the previously negotiated plea agreement. Under these circumstances, I discern no injustice, manifest or otherwise, in the trial judge's resolution of the case. Accordingly, I respectfully dissent.



---

**1.** This may have been what the prosecutor meant when he referred to the changes in the plea agreement as "slight." It is true that Eldridge was sentenced to serve no less than five years and no more than fifteen on Count 20, which was not part of the original package. We do not know, however, whether the same sentences would have been imposed on the other counts under the original package; the judge "may have chosen to spread the aggregate sentence over all of the counts." *Bean v. United States,* 606 A.2d 770, 772 (D.C.1992) (per curiam).

**2.** My colleagues do not discuss the facts of the crimes which Eldridge committed. Briefly, according to the prosecution's proffers, almost all of which he conceded to be accurate, Eldridge raped and robbed two victims in separate incidents; choked a third woman and beat her about the head and breasts, intending to rape her; choked and punched a fourth woman; and burglarized the apartment of a fifth woman after swinging a chair at her, pulling her sweater over her head, and removing her jewelry. With due respect to my colleagues, I do not understand how the severity and depravity of Eldridge's crimes could be irrelevant to the question whether the sentence resulting from the perceived defect in the trial court's proceedings was "manifestly unjust."

F I L E

**MAR 3 1 1999**

DISTRICT OF COLUMBIA
COURT OF APPEALS

## DISTRICT OF COLUMBIA COURT OF APPEALS

### Nos. 93-CO-999 & 96-CO-1935

CLINTON T. ELDRIDGE,
APPELLANT,

v.                    CR F-6638-83

UNITED STATES,
APPELLEE.

Appeals from the Superior Court of the
District of Columbia
Criminal Division

(Hon. Eugene N. Hamilton, Trial Judge)

(Argued January 28, 1999          Decided March 31, 1999)

Before WAGNER, *Chief Judge*, and STEADMAN and REID, *Associate Judges*.

### MEMORANDUM OPINION AND JUDGMENT

After a lengthy procedural history, appellant continues to challenge both his guilty plea and his resentencing for assorted violent crimes. We have reviewed the arguments presented by counsel and those presented in appellant's pro se brief. We affirm.

### I.

In early 1984, appellant Eldridge was indicted on 37 counts of rape, burglary, and assorted accompanying offenses. *Eldridge v. United States*, 618 A.2d 690, 693 (D.C. 1992). Ultimately the prosecution designed what it thought was an agreed upon plea package consisting of eight counts involving five separate victims. *Id.* at 693. During the plea hearing on May 14, 1984, appellant denied culpability on one particular count regarding the rape of victim JM, and stated he was not aware that the count was to be included in the plea bargain. In response, the prosecution modified its offer to a nine count plea that included lowering the contested charge from rape to assault with intent to rape, allowing appellant to make an *Alford*[1] rather than a factual guilty plea to this count, and adding a count of burglary of one of the other victims, already the subject of a rape count to which appellant was to plead guilty. Appellant accepted the new package. *Id.* at 693-694. The trial court imposed consecutive sentences aggregating to a minimum of 40 and maximum of 120 years. *Id.* at 694.

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970).

2

After his initial sentencing appellant filed a number of collateral attacks to withdraw his guilty plea under Super. Ct. Crim. R. 32(e) and to vacate his sentence under D.C. Code § 23-110 (1996) which were consolidated by the trial court. *Id.* His allegations included discovery violations and ineffective assistance of counsel,[2] as well as involuntary pleading. The trial court held a hearing and found none of the allegations meritorious, issuing a 47 page order on May 26, 1988. *Id.* Appellant appealed that order to this court; we affirmed the trial court's rulings on all matters except the voluntariness of the plea to the ninth count, and remanded the case for resentencing on the remaining eight counts. *Id.* at 698. On remand, the trial court redesigned its sentencing package with a resulting aggregate sentence that matched its original 40 to 120 year sentence. On appeal, appellant, through counsel, contends that the new sentence was presumptively vindictive and therefore invalid, and, in a pro se brief, calls to our attention certain additional issues relating to discovery, raised in his new motions that were denied by the trial court.

II.

A.  **Resentencing**

Appellant contends that the increase in the sentence imposed on remand for one of the original eight counts to which he pleaded guilty is a due process and double jeopardy violation. He argues for application of the legal presumption of vindictiveness articulated by the Supreme Court in *North Carolina v. Pearce*, 395 U.S. 711 (1969). Alternatively, appellant argues that the resentencing shows evidence of actual vindictiveness.

*Pearce* held that a new more severe sentence after retrial for the same crime is presumed to be vindictive and impermissible punishment for a successful appeal, and that such a presumption can be rebutted only by evidence of new information made available to the sentencing judge, or new conduct by the defendant, warranting the higher sentence. *Pearce, supra,* 395 U.S. at 723, 726. That presumption is designed to assure that defendants are not deterred from pursuing collateral attacks and appeals because of fear of judicial retaliation. *Id.* at 725. However, in multiple count situations, the majority of jurisdictions limit application of *Pearce* to cases in which the new aggregate sentence for remaining

---

[2]   Between February and May of 1984, appellant had made discovery requests pro se and was also represented by counsel, although counsel did not independently file any motions.

3

counts is more severe than the original sentencing plan.[3] *United States v. Campbell*, 106 F.3d 64, 67-68 (5th Cir. 1997); *see, e.g., United States v. Pimienta-Redondo*, 874 F.2d 9 (1st Cir. 1989). In this jurisdiction, we have taken this majority position in *Eldridge, supra*, and in *Johnson v. United States*, 628 A.2d 1009, 1014 (D.C. 1993), and we follow those authoritative cases here.

Because the aggregate sentence on remand in this case does not exceed the aggregate sentence originally imposed on appellant, he cannot receive the benefit of the *Pearce* presumption under our rule. Additionally, appellant's assertion of actual vindictiveness is unsupported by the facts. The trial judge made clear his original intent was to impose consecutive sentences in a scheme designed to take into account each of the five separate incidents with five separate victims. After one count was vacated, there nonetheless remained eight counts covering five incidents with five victims. The trial court adjusted the sentence for rape that had accompanied the vacated sentence for burglary of the same victim so as to retain the same total sentence. Under similar circumstances, we found no error in a resentencing that mirrored the original sentence. *See Bean v. United States*, 606 A.2d 770, 772 (D.C. 1992).

B.   **Discovery Violations**

Appellant acting pro se raises certain additional arguments. His general allegations of (1) the prosecution's refusal to respond to his discovery requests and (2) his counsel's ineffective pursuit of compliance, were amply addressed by the trial court's 1988 order and were upheld by this court on his prior appeal. We do not review these already settled claims. *Doepel v. United States*, 510 A.2d 1044, 1045-46 (D.C. 1986). Further, once he entered his guilty plea, the appellant forfeited his claims of discovery defects. *Collins v. United States*, 664 A.2d 1241, 1243 (D.C. 1995); *United States v. Fitzgerald*, 151 U.S. App. D.C. 206, 208, 466 F.2d 377, 379 (1972).

As allegedly new arguments, appellant asserts that certain lab tests he had not seen prior to the remand exonerate him.[4] However,

---

[3]   A minority of jurisdictions apply a methodology that compares the original aggregate sentence only on the non-reversed counts with the sentence post-appeal, and grants the *Pearce* presumption when the latter "remainder-aggregate" sentence is higher. Thus far, only the Second and Eleventh Circuits have taken such an approach. *United States v. Campbell*, 106 F.3d 64, 68 (5th Cir. 1997).

[4]   We assume for purposes of this appeal that this disputed fact of timing is as appellant asserts.

4

as appellant's own trial counsel acknowledged to the trial court, these tests are inconclusive at best.[5] When viewed along with the other evidence amassed by the prosecution, including other forensic evidence and witness identifications from line-ups, the "new" evidence hardly makes it "more likely than not that no reasonable juror would have convicted him," *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995), or otherwise compels relief.

Appellant also baldly asserts that the prosecution knew about the existence of these reports, but failed to timely turn them over to him, and that had he known of the reports, he would not have pled guilty.    However, appellant offers no evidence that the prosecution actually withheld available evidence that it had a duty to disclose.  On the contrary, as the trial court noted in denying appellant's previous motions, prior proceedings on discovery questions indicated that the government made clear that several reports remained outstanding as of the last status conference prior to the trial date.[6]  As the trial court also then noted, appellant chose to move forward with his plea rather than await the complete processing of all evidence, a decision that cannot be recanted simply because the appellant no longer believes the government's case against him is as strong as he once did.  *United States v. Broce*, 488 U.S. 563, 571-72 (1989).

Accordingly, it is hereby ORDERED and ADJUDGED that the judgment on appeal is affirmed.

Copies to:

Hon. Eugene N. Hamilton

Clerk, Superior Court

Stuart Fisk Johnson, Esq.
406 5th St., NW
Washington, DC  20001

John R. Fisher, Esquire
Assistant United States Attorney

For the Court:

Garland Pinkston, Jr., Clerk

---

[5]  For example, the blood type of the perpetrator of a crime can be "masked" when, as was the case here, the victim's blood is also present, and that victim is a secretor of certain masking substances.

[6]  It appears from the record that some reports were transmitted to the prosecution after the status hearing but prior to the trial date during which appellant entered his plea. Nonetheless, appellant provides no evidence that these reports were not promptly disclosed to him, or that their voluntary disclosure was mandated.

## DISTRICT OF COLUMBIA COURT OF APPEALS



No. 02-CO-583

CLINTON T. ELDRIDGE, APPELLANT,

v.  F-6638-83

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
Criminal Division

(Hon. Eugene N. Hamilton, Trial Judge)

(Submitted April 23, 2003                    Decided April 23, 2003 )

Before TERRY and REID, *Associate Judges*, and FERREN, *Senior Judge*.

## MEMORANDUM OPINION AND JUDGMENT

Appellant Clinton Eldridge, acting *pro se*, appeals from the trial court's denial of his "Petition for Writ of Habeas Corpus," filed pursuant to D.C. Code § 23-110 (2001).  We affirm.

### FACTUAL SUMMARY

In 1984, Mr. Eldridge entered guilty pleas to various charges including rape, robbery, and burglary.  We addressed his direct appeal and related motions in *Eldridge v. United States*, 618 A.2d 690, 693 (D.C. 1992) (*Eldridge I*).

Subsequently, we disposed of two collateral appeals filed by Mr. Eldridge.  These appeals pertained to his resentencing and his allegations concerning various discovery matters, as well as his assertion that the government withheld information that would have exonerated him.  *See Eldridge v. United States*, Memorandum Opinion and Judgment, Nos. 93-CO-999, 96-CO-1935 (D.C. March 31, 1999) (*Eldridge II*).  Mr. Eldridge then filed a writ of certiorari to the Supreme Court, which was denied on January 10, 2000.

2

Almost two decades after his initial convictions, over a decade after our initial published opinion, and over four years after our subsequent memorandum opinion and judgment, Mr. Eldridge filed a "Petition for Writ of Habeas Corpus" pursuant to D.C. Code § 23-110 on March 15, 2001, a related letter on November 9, 2001, and a supplement-in-aide of writ of habeas corpus on February 11, 2002. On April 24, 2002, the trial judge issued an order detailing the procedural history of Mr. Eldridge's case, noting each motion filed by him and the disposition by the trial court and this court. The trial court denied Mr. Eldridge's petition as a successive claim for collateral relief under D.C. Code § 23-110 (e), stating, in part:

> [Mr. Eldridge's] current motion does not bring up any new issues of law regarding this case that have not been previously addressed. This Court sees this as a successive motion for similar relief, and a waste of the Court's time and resources. As such, this Court relies on D.C. Code § 23-110 (e) which states, "The court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." Based on the totality of the circumstances, the Court continues to find that the imposed sentence is fair and just. Since this is [Mr. Eldridge's] sixth motion for similar relief relying on the same facts that this Court has already ruled upon, . . . [Mr. Eldridge's] Motion is Denied.

## ANALYSIS

Mr. Eldridge raises several contentions, in his main brief on appeal, relating to 1) an alleged Fourth Amendment violation (warrantless search and seizure); 2) the relationship between the Fourth Amendment argument and discovery; 3) the government's alleged failure to present exculpatory evidence to the grand jury; 4) ineffective assistance of counsel at all stages of the proceedings; 5) his guilty pleas and Rule 11; 6) alleged misleading statements by the government concerning the evidence against him; and 7) his second sentencing and constitutional double jeopardy. He also maintains that his 2001/2002 filings did not constitute a successive § 23-110 motion and that he was entitled to a hearing.[1] The government argues that all of the points raised by Mr. Eldridge on appeal either were adjudicated previously, or are "barred as an abuse of the writ [of habeas corpus]."

---

[1] Mr. Eldridge also filed a reply brief and a supplement to his reply brief. His reply brief discusses the Fourth Amendment, double jeopardy, and Rule 11/guilty plea issues. His supplement explains why he attached the case of United States v. Whitfield, 291 U.S. App. D.C. 243, 939 F.2d 1071 (D.C. Cir. 1991).

3

"Although a defendant is presumptively entitled to a hearing on a motion brought pursuant to D.C. Code § 23-110, no hearing is required where his allegations would merit no relief even if true." *Diamen v. United States*, 725 A.2d 501, 513 (D.C. 1999). In addition, claims which are "vague and conclusory" do not "require a hearing." *Vaughn v. United States*, 600 A.2d 96, 97-98 (D.C. 1991). Furthermore, D.C. Code § 23-110 (e) specifies: "The [trial] court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." Thus, "[t]o the extent that the allegations in the [§ 23-110] motion merely repeat the previously rejected contentions in the habeas corpus petition, they need not have been considered by the trial court judge." *Hurt v. St. Elizabeths Hosp.*, 366 A.2d 780, 780 (D.C. 1976) (subsequent § 23-110 motion merely duplicated habeas corpus petition). Also, "[i]t is well-settled that where an appellate court has disposed of an issue on appeal, it will not be considered afresh on collateral attack in a trial court of the same judicial system, absent special circumstances." *Doepel v. United States*, 510 A.2d 1044, 1045-46 (1986). And the "abuse of writ" doctrine set forth in *McCleskey v. Zant*, 499 U.S. 467 (1991), "generally bars subsequent consideration of claims not raised, and thus defaulted, in the first [collateral] proceeding." *Matos v. United States*, 631 A.2d 28, 30 (D.C. 1993).

Based on our review of the record on appeal, we agree with the trial court that all of the issues raised by Mr. Eldridge have been considered before by the trial court and this court. Indeed, these issues were disposed of either in *Eldridge I, supra*, or *Eldridge II, supra*, and we are not obliged to consider them again, *Hurt, supra*, or in the absence of "special circumstances," *Doepel, supra*. We discern no such circumstances in this case.

Furthermore, even assuming as new arguments, Mr. Eldridge's 1) Fourth Amendment warrantless search contention, including its alleged relationship to discovery, or 2) his assertion regarding the plain error review of the guilty plea matter, they are barred under the abuse of writ doctrine articulated in *McCleskey, supra*.[2] As the trial court noted, this is Mr. Eldridge's "sixth motion" for relief from his convictions, and any new claims have been "defaulted." *Matos, supra*, 631 A.2d at 30 (citing *McCleskey, supra*). In addition, nothing

---

[2] The record reveals that Mr. Eldridge previously raised a claim that his trial counsel was ineffective because of a failure to file a motion to suppress physical evidence, and that his contentions regarding Rule 11 and his guilty pleas have been raised and considered more than once. His ineffective assistance of counsel claim was discussed in the trial judge's 1988 and 1995 orders, and summarily affirmed in *Eldridge I, supra*, 618 A.2d at 693, n.3, and *Eldridge II, supra*, at 3, respectively. His Rule 11 and guilty plea arguments were addressed extensively in *Eldridge I, supra*, and in the trial court's 1995 order. Mr. Eldridge's alleged discovery claims concerning the government withholding FBI and lab reports, Sup. Ct. Crim. Pro. R. 16 violations, and making misrepresentations before the trial court were rejected in the trial judge's 1995 and 1996 orders, and those orders were affirmed in *Eldridge II, supra*, at 3-4. Mr. Eldridge's claim that the trial court's resentencing violated the Double Jeopardy Clause was rejected in the trial court's 1996 order, and affirmed in *Eldridge II, supra*, at 2-3.

4

in the record convinces us that Mr. Eldridge was entitled to a hearing on his petition. *Diamen, Vaughn, supra.*

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.

*So ordered.*
FOR THE COURT:

GARLAND PINKSTON, JR.
Clerk of the Court

Copies to:

Hon. Eugene N. Hamilton

Clerk, Superior Court

Clinton T. Eldridge
#00545-000
P.O. Box 1000
Marion, IL 62959

John R. Fisher, Esq.
Asst. United States Attorney



## Family Counseling Center

1500 North Beauregard Street ● Suite 200 ● Alexandria, Virginia 22311 ● (703) 931-0100

SUMMARY OF PSYCHIATRIC EVALUATION

Name of Patient:      Clinton T. Eldridge
                      Criminal Docket # F6638-83

Date of Evaluation:   3-26-84

Mr. Eldridge was a 22 year old black single male restaurant worker who was seen for psychiatric evaluation to assess his competency to stand trial and also his state of mind at the time of the alleged offense. The client was referred to me for this evaluation by his attorney, James H Tatem. I saw Mr. Eldridge for this evaluation on 3-26-84 at the D.C. Detention Facility. It was my understanding that he had been charged with 37 criminal violations, which had arisen out of about 7 different incidents. The violations included assault, burglary, sodomy, rape, rape while armed, and robbery. In addition to interviewing Mr. Eldridge, I also spoke to his mother on the telephone in order to obtain additional history. I also reviewed various correspondence, including a lengthy autobiographical account by Mr. Eldridge, which had been written on 12-22-83.

Client's View of the Current Situation. Mr. Eldridge said that he had been released from the Youth Center at Lorton in March 1983. He was living at his mother's household and had several different jobs. He said that several months ago he was "picked up for a rape charge." He was taken to a lineup and was picked out for several other charges. He knew that he was being charged with 37 different violations, which occurred on 7 different days. Mr. Eldridge acknowledged that he had broken into one of the houses, but he denied raping anybody. He said that he had been offered a plea bargain and that he was probably going to plead guilty to two attempted rapes, two robberies, and two buglaries. I told Mr. Eldridge that I had heard that a raincoat and a ring had been found in his room at home, which had been reportedly taken from two of the victims. He became somewhat more hesitant in his answers at that point and explained that he shared a room with his brother and he thought that the ring may have belonged to a girlfriend of his brother's. He said that he didn't see how anybody could identity a particular raincoat, since it did not have a serial number or other specific identification in it. He thought that even with the plea bargain he would probably get sentenced to more than 15 years, because it involves 5 felonies. He suggested that the 5 year sentence might be suspended and perhaps he could be put into some kind of treatment program, like the one that he had previously been in at Area C Community Mental Health Center. He said that he thought it would be useful for him to go to movies and bowling and other constructive things; that he would be able to have his own apartment; and that he would engage in some work such as carpentry or delivering items.

Clinton T. Eldridge
Page 2

Past History. Mr. Eldridge's interview information, the autobiographical statement, and his mother all indicate that he has been a serious behavior problem since early childhood. His life was difficult. His mother had psychiatric problems and was hospitalized, so Mr. Eldridge was raised by his maternal grandmother. As an adolescent he was sent to live with his father, who beat him severely, so he returned to the mother's house. He has been in trouble with the police since about age 13 and has been in and out of penal and psychiatric institutions since then. I gather that he was first evaluated and treated as an outpatient when he was about 9 years old, after he had set his bed on fire. He reportedly was an inpatient at SEH for about 6 months when he was 15, at Area C for about a year at age 16, and again at SEH for about 9 months at age 18.

Medical Information. Although he has had several psychiatric hospitalizations, Mr. Eldridge denied medical hospitalizations. He said that he fractured his left thumb on one occasion and at another time had a "bad accident on a bicycle." He denied serious illnesses. There are no known allergies to medication. He said that the only medication he is currently taking is Mellaril 100 mg, because he had tried to hang himself in the jail with a sheet. He said that he smokes about ½ pack of cigarettes a day. He said that customarily he would drink a great deal of alcohol every day, including beer, rum, and brandy. Associated with the drinking he reported having several blackout periods. He said that on the street he would use 3-4 bags of marijuana a day and that he was also using PCP every day. Although he used cocaine a few times, he denied use of heroin. Mr. Eldridge denied being intoxicated at the time of the alleged incidents.

Mental Status. Mr. Eldridge was a healthy appearing husky black man who wore glasses and had a closely trimmed beard. He was congenial and cooperative and talkative during the interview. He did become somewhat defensive and perhaps evasive when he was trying to explain how the victims' property may have been found in his room. His speech was logical and coherent and there was no evidence of thought disorder. He was alert, oriented, had intact memory, and seemed about average intellectually. There is no evidence of delusions or hallucinations. His mood was appropriate to the situation. Although he described having had periods of discouragement and depression, he was not seriously depressed at the time of the interview. He described having previously thought about suicide and said that hanging was the quickest way to do it. In the interview Mr. Eldridge emphasized how difficult his life had been and how he had been influenced by others. He summarized both his criminal and his psychiatric history. He acknowledged that when he became high on the street he was more likely to get strong sexual feelings and on those occasions he might try to talk to a young lady. He said that he had previously had a girlfriend and had many other female friends. He described a normal sexual relationship with his girlfriend. He said that prior to incarceration he did not masturbate and did not engage in homosexual activities. Mr. Eldridge flatly denied almost all of the charges against him, so it was hard to relate any psychiatric disorder to the alleged criminal behavior. In terms of his competency, Mr. Eldridge completely understood the nature of the charges and the implications and possible consequences. He understood the court procedures and was able to cooperate with his attorney.

Impressions.
1. Mr. Eldridge is competent to go to trial.

Clinton T. Eldridge
Page 3

    2.  Mr. Eldridge has had long standing psychiatric, social, and behavioral problems.  He has abused a variety of drugs, especially marijuana and alcohol.  The primary psychiatric diagnosis would be antisocial personality disorder.

    3.  There is no indication during this evaluation that Mr. Eldridge's alleged behavior was the product of a mental disease or defect.  There is no indication that he did not know what he was doing at the time of the alleged offense or that he was not able to control his behavior.

    Distribution of This Report.
    1.  Patient's file.
    2.  James H. Tatem

William Bernet, M.D.
Director

4-30-87

1    SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

2    CRIMINAL  DIVISION

3    - - - - - - - - - - - -x
     :
4    UNITED STATES OF AMERICA :
     :
5         vs         :          Criminal Action F-663-83
     :
6    CLINTON T. ELDRIDGE,      :
     :
7         Defendant.      :          Volume 1 of 2
     :
8    - - - - - - - - - - - -x

                                              30th
9                          Washington, D. C.
                           Thursday, April 20, 1987
10

11        The above-entitled action came on for a hearing
     before the Honorable EUGENE N. HAMILTON, Associate Judge, in
12   Courtroom Number 43, commencing at approximately 1:15 p.m.

13        THIS TRANSCRIPT REPRESENTS THE PRODUCT
          OF AN OFFICIAL REPORTER, ENGAGED BY THE
14        COURT, WHO HAS PERSONALLY CERTIFIED IT
          REPRESENTS THE ORIGINAL NOTES AND RECORDS
15        OF THE PROCEEDINGS, AS RECORDED.

16        APPEARANCES:

17        On behalf of the Government:

18        COLEEN KENNEDY, Esquire
          Assistant United States Attorney

19
          On behalf of the Defendant:
20
          STUART F. JOHNSON, Esquire
21        Washington, D. C.

22

23

24   Mark P. Schertzer
     Official Court Reporter

25

FORM SEL-711  REPORTERS PAPER & MFG. CO.  800-626-6313



P. 132

# TABLE OF CONTENTS
## WITNESS

For the Defendant:                    Direct    Cross    Redirect

Clinton T. Eldridge                      8        89

James H. Tatem                         132       161       187

## EXHIBITS                                    Marked   Received

For the Defendant:

No. 1, document                                  43

No. 2, document                                 187

No. 3, document                                 193

No. 4, document                                 194

## Miscellany

Preliminary matters        ----------------------      3

Proceedings on 5/1/87      ----------------------    164

Certificate of Reporter ----------------------      208

P 140    re revised plan/fn

P

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

2

Q.    For each offense, before you pled guilty, isn't that right?

A.    Yeah, I remember when we got the transcripts, it was in the transcripts.  But prior to before that, I didn't know.

Q.    Well, once you read the transcript, you knew that you had been told at the plea proceedings what the minimum and the maximum was, right?

A.    Yes, but my petition was filed, before I obtained the transcript.

Q.    I'm not talking about the petition.  I'm talking about at the time you pled guilty, you knew what you were facing by way of time, as far as a minimum and a maximum sentence?

A.    At sentencing?

Q.    At the time you pled guilty?

A.    Did I know understandingly -- understand --

Q.    The Judge told you all that?

A.    No, I didn't understand all of that.

Q.    What my question is, the Judge told you what the minimum and the maximum sentence was?

A.    Yes, he told me, because it appears in the transcript.

Q.    All right.  You also testifed on direct, Mr. Eldridge, that you didn't know anything about the evidence

120

1    that was recovered by the government, and you don't remember

2    the Court asking you anything about any of that evidence, is

3    that right?

4        A.    Yes, I said that I ain't never received the evidence,

5    and everything.  And I said I was never appraised of the

6    government's burden of proof.

7        Q    Well, Mr. Eldridge, isn't it correct that at the

8    time you pled guilty, the Court asked you regarding some of

9    the property that you came in contact with that -- this is

10    the question by the Court:

11        "Mr. Eldridge" -- I'm sorry, page 15-- "Did

12    you have occasion to come in contact with certain

13    property that belonged to Ms. McNair and Ms. Yen?"

14        "THE DEFENDANT:  Yes, Your Honor."

15        "THE COURT:  What was the nature of that

16    property at that time?"

17        "THE DEFENDANT:  Rain coat and jewelry."

18        "THE COURT:  What happened to that raincoat

19    and jewelry?"

20        "THE DEFENDANT:  Gave the jewelry to my

21    sister, had the raincoat hanging up on my base-

22    ment door."

23        Do you remember that?

24        A.    Yes, I remember it.  It's in the transcript.

25

121

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

Q.    So isn't it correct, Mr. Eldridge, that you knew exactly what property the government was talking about, you, in fact, told the Court right here, what happened to the jewelry and the raincoat?

A.    Yeah.  It was a misunderstanding about the jury, though.

Q.    What was the misunderstanding?

A.    Somebody said a watch and somebody said a red necklace.  I don't know which one it was.

Q.    Well, that's not said in here, it just says, jewelry, isn't that correct?

A.    Yes, jewelry, yes.

Q.    And isn't it true that you did give the jewelry to your sister and that the raincoat was hanging up on your basement door?

A.    What was that?

Q.    Isn't that true that you gave the jewelry to your sister and the raincoat was hanging up on your basement door, just as you told the Court?

A.    I gave my sister some jewelry.  Not only a raincoat was hanging on my basement door.  Winter coats was hanging on my basement door that belonged to other females.

Q.    But when the Judge asked you regarding the jewelry and the raincoat that you stole from Virginia McNair, you said you gave that jewelry to your sister and that raincoat

122

1        Thereupon,

2                JAMES H. TATEM,

3    was called as a witness for and on behalf of the defendant,

4    and having been first duly sworn by the Deputy Clerk, was

5    examined and testified as follows:

6                DIRECT EXAMINATION

7        BY MR. JOHNSON:

8        Q.    Good afternoon, Mr. Tatem.

9              State your name and address.

10       A.    James H. Tatem, 1010 Vermont Avenue, Northwest,

11   Washington, D. C.

12       Q.    All right.  And how long have you been practicing

13   law, in general?

14       A.    Since 1968, I believe.

15       Q.    All right.  And where are you admitted to practice?

16       A.    Washington, D. C., Virginia, and the State of New

17   York.

18       Q.    All right. And were you admitted in all three of

19   those jurisdictions in May of 1984?

20       A.    I believe I was.

21       Q.    All right.  And at the time you were representing

22   Mr. Eldridge in the case that this hearing is about, were you

23   also handling cases in New York City?

24       A.    Back in '83, I think so.

25       Q.    '83 and '84?

FORM SEL-711   REPORTERS PAPER & MFG. CO.   800-626-6313

A.     I believe so.

Q.     All right.  And you've been in this courtroom and heard the entirety of Mr. Eldridge's testimony, is that correct?

A.     I have.

Q.     On the date of the presentment in this case, this rape case, in November 18, 1983, you were appointed as the attorney under the Criminal Justice Act, is that correct?

A.     That's correct.

Q.     All right.  Do you recall whether the presentence report in this case, indicated that Mr. Eldridge had a history of mental problems and hospitalizations?

A.     No, I do not recall.

Q.     All right.  What caused you to obtain the services of William Bernet, M.D., to evaluate Mr. Eldridge?

A.     Through the process of elimination.  When I got Mr. Eldridge's case, he told me that he had a number of things happen.  First he indicated that he was not involved with any of these people, that he was someplace else.  That collapsed.  We weren't able to do anything with that.

Then we went to the items which were found in his house, the jewelry and the raincoat.  He then told me that they belonged to his sister and other members of his family.

The sister, Ms. Card, Vivian, denied any items belonging to them, and, in fact, indicated that when the

133

police had come in to confiscate those items, they also took
other items, such as pictures that Mr. Eldridge had taken
of nude people, of nude women, and so on.

We then got to the point, Mr. Eldridge then indi-
cated that he had had one contact with St. Elizabeth's
in Area C. And that he wasn't feeling well, and then he
attemped suicide.

The investigator, to my knowledge, went down to
the jail and he was put on a watch. On the basis of that and
through the process of elimination, we talked about a possible
insanity defense.

On the basis of that, I asked for a voucher and got
a voucher for Dr. Bernet to do an examination of Mr. Eldridge,
to determine whether or not, he, in fact, was competent,
and whether or not, at the time of the acts, he was suffering
from a mental disease. And that was the purpose for Dr.
Bernet examining him.

Q     All right. And then you subsequently got a written
report from Dr. Bernet?

A     That is correct.

Q     A three page report?

A     I don't remember how many pages. I would have to
count them, but if you say three, pages it's three pages.

Q     All right. Did you have that written report --
well, I'd like to show you government's opposition, which has

134

1  Q Fine.  If the plea had not taken place on the 14th

2 of May, the case probably would have gone to trial?

3  A. Yes.

4  Q And were there any witnesses under subpoena from

5 the defense?

6  A. We would have used his sister who was here.  He

7 had told me that the jewelry that they took out was the

8 sisters, and if he had insisted, I would have called her and

9 she would have taken the stand and said that jewelry wasn't

10 mine.

11  Q All right.

12  A. And we would have gone.  As to anything else, that's

13 all he had, plus what he could muster when he took the stand.

14  Q All right.  Did you check the alibi out?

15  A. I didn't, but Mr. Hogue did.

16  Q And it didn't --

17  A. It didn't pan out.

18  Q All right.

19  A. And, in fact, when talking to him, so many things

20 happened in the evening, which means he would have been off

21 work.  And then we got into, maybe he didn't take that route

22 or that wasn't him, or he didn't fit the dress.  But it just

23 did not pan out.

24  Q All right.  What about Mr. Eldridge's allegations

25 that you have heard, that you didn't tell him the results

157

FORM SEL 711   REPORTERS PAPER & MFG. CO   800-626-6313

1    of any discovery meetings with Mr. Hall?

2        A.    I did.  Because he knew the pubic hairs.  I made

3    notes.  We had discovery of Mr. Hall on two days.  It was

4    March the 7th or maybe a week or week and a half after that.

5            The FBI reports we went over.  We went over --

6        Q.    You went over those with Mr. Eldridge?

7        A.    Yes.  How did -- that's how I found out about the

8    pictures, where -- at that point in time, I was shown the

9    pictures, the ones with the sanitation -- the one with the

10   sanitary napkin  and the one with the broken chair, and

11   other stuff.  And that was explained to him.

12       Q.    All right.

13       A.    And he, in turn --

14       Q.    All right.  Did you show --

15            MS. KENNEDY:  Your Honor --

16            THE COURT:  Just a minute, Mr. Johnson.

17            MR. JOHNSON:  I'm sorry.

18            THE COURT:  Please, sir.

19            THE WITNESS:  No, I don't believe he saw the

20   photos.  I made notes.  I went back to him and described them

21   to him.  And that's when he told me what he did and did not

22   do, which rapes he did or did not commit, or what he actually

23   did when he was there.

24            BY MR. JOHNSON:

25       Q.    Did you tell Mr. Eldridge before the plea, about

FORM SEL-711  REPORTERS PAPER & MFG. CO  800-626-6313

<u>CERTIFICATE OF REPORTER</u>

I, Mark P. Schertzer, an Official Court Reporter for the Superior Court of the District of Columbia, do hereby certify that I reported by machine shorthand and a tape recording, in my official capacity, the proceedings had and testimony adduced upon the motion, UNITED STATES OF AMERICA vs CLINTON T. ELDRIDGE, Criminal Action F-663-83, in said court, on the 30th day of April, 1987.

I further certify the foregoing 161 pages constitute the official transcript of the proceedings, as taken from my stenographic notes, together with the backup tape of said proceedings.

This 30 day of March, 1990.



Mark P. Schertzer
Official Court Reporter

RECEIVED
MAR 30 | 21 PM '90
COURT REPORTING DIV.
DISTRICT OF COLUMBIA
COURTS

162

District of Columbia Superior Court
Office of the United States Attorney

## United States
## VS

Clinton Theodore Eldridge


On 11/7/83, Ms Julia McKenzie, White/ Female, reported that a Black/Male 23 yrs to 27 years of age, 6 feet tall, medium Build, medium to dark complexion, wearing a gray ski hat with a playboy bunny on it and a navy hip length jacket, followed her forced his way into her house at 1365 A St. N.E. at about 6:00 P.M. Once through Lincoln Park inside he beat her and forced her to have sexual intercourse and oral intercourse with to her house several items of jewelry from her person. where he rap

On 11/11/83, Ms Mary C Currall reported that as she climed the steps to a friends house at 1351 A St. N.E., on 10/30/83, at about noon a man, she later identified as Clinton Eldridge, from a spread of ten color photographs, approached her from behind and, his hand under her dress between her legs. She confronted him and he ran. put in

On 11/17/83, a warrant was obtained for Clinton Eldridge, charging him with assaulting Mary Currall. He was arrested pursuant to the warrant that same day at approximately 9:30 P.M. as he was attempting to board a bus to New York City. A consent to searh his residence at 1345 Constitution Ave. N.E., was obtained and recovered was the clothing matching the description given by Julia Mckenzie, as being worn by the man who raped her on 11/7/83.

Clinton Eldridge, told the police that within a couple of weeks prior to his arrest he followed a white women through Lincoln Park to her home on the 1300 block of A St. N.E. There he asked her to have sex with him but she refused. Then she changed her mind and invited him inside her house where he said they had consentual sexual intercourse.

Ex "J"

DISTRICT OF COLUMBIA

COURT OF APPEALS

**App. No. 02-CO-583**

Clinton T. Eldridge,          ) Cri.  #F6638-83
                              )
      Plaintiff,              )
                              )
      vs.                     )
                              )
United States of America,     )
                              )
      Defendant               )

DECLARATION OF VIVIAN EDMONDS

    I, Vivian Edmonds, hereby and certify pursuant to the provisions of Title 28 U.S.C.1746, and declare under penalty of perjury under the laws of the United States of America, and the District of Columbia that the statements made herein are true and correct to the best of my knowledge and belief.

    1.    I am the mother of Clinton T. Eldridge who is at the present time, incarcerated at the U.S.P Marion, P.O. Box 1000, Marion, Ill. 62969, and his number is #00545-000.

    2.    I am the owner of the home where Clinton Eldridge resided at 1345 Constitution Ave N.E. and I am currently a citizen of the District of Columbia, and currently resides at 1345 Constitution Avenue, N.E. Washington D.C. 20002.

3.   I have lived here since the purchase of the home in 1972. I am over the age of 18, and I submit this declaration on the behalf of my son Clinton T. Eldridge, and I do so willingly.

4.   Before the time of Clinton's arrest, he was living in the basement of the family's home with my approval he was allowed complete and total privacy in the area of the basement considered as his room, and to the best of my knowledge, we all respected this and had no reason or need to enter this area of the house.

5.   Clinton remained employed, and he like everyone else of working age contributed to the expenses of the house, at least once or twice a month, which ever way was convenient for him. This would help cover the cost of his room and board.  Every now and then he may give or lend his brothers and sisters money if they needed it.

6.   On November 17, 1983, Clinton was not at home, around 9:00 p.m., Some of the children noticed police cars outside the window of our home and officers approaching the house to knock on the front door.  They knocked and asked if Clinton was home and were informed them they he wasn't, and one officer produced a arrest warrant, so they were allowed to come in and look to see if he in fact was home. After they found that he was not there, they began to search the house without permission from me (the owner) and they never produced a search warrant or asked if they could search the home.       There was no one else in the home who could have given the police permission to search my home as I was the only one there who owned the house.  I did not see the officers take  any of Clinton's belongings from the house and even as they were leaving there still was never the presentation of a search warrant.  I'm not certain how many

officers came into the house and/or searched the house, but there were definitely more than two. I am certain that no member of the family and positively not myself had given the consent to search our home. Later that night we learned they had arrested Clinton and taken him to the police station.

8. I declare that this declaration is true and correct to the best of my knowledge and belief, and that it was made in good faith in the above case of Eldridge vs. United States of America, #02-CO-583.

Executed on this ___19___ day of ___Nov___ 2002.

Respectfully Submitted,

*Vivian Eldridge Edmonds*

Vivian Eldridge-Edmonds

1345 Const. Ave. N.E.

Washington, D.C. 20002

_Ex. 6_

DISTRICT OF COLUMBIA

COURT OF APPEALS

**App. No. 02-CO-583**

Clinton T. Eldridge,                    )
                                        )  Cri.  #F6638-83
      Plaintiff,                        )
                                        )
      vs.                               )
                                        )
United States of America,               )
                                        )
      Defendant                         )

## DECLARATION OF VIVECA CARD

I, _Viveca Card,_ hereby and certify pursuant to the provisions of Title 28 U.S.C.1746, and declare under penalty of perjury under the laws of the United States of America, and the District of Columbia that the statements made herein are true and correct to the best of my knowledge and belief.

1.    I am the younger sister of Clinton T. Eldridge who is at the present time, incarcerated at the U.S.P Marion, P.O. Box 1000, Marion, Ill. 62969, and his number is #00545-000.

2.    I am the daughter of Mrs. Vivian Eldridge Edmonds who is a citizen of the District of Columbia, and currently resides at 1345 Constitution Avenue, N.E. Washington D.C. 20002.

3.   I share this residence with my mother Vivian Edmonds, who has lived here since the purchase of the home in 1972.  I am over the age of 18, and I submit this declaration on the behalf of my brother Clinton T. Eldridge, and I do so willingly.

4.   Before the time of Clinton's arrest, he was living in the basement of the family's home with the approval of our mother, he was allowed complete and total privacy in the area of the basement considered as his room, and to the best of my knowledge, we all respected this and had no reason or need to enter this area of the house.

5.   Clinton remained employed, and he like everyone else of working age contributed to the expenses of the house, at least once or twice a month, which ever way was convenient for him. This would help cover the cost of his room and board.  Every now and then he may give or lend us (his brothers and sisters) money if we needed it.

6.   On November 17, 1983, Clinton was not at home, around 9:00 p.m., I noticed police cars outside the window of our home and officers approaching the house to knock on the front door. they knocked and asked if Clinton was home and I informed them they he wasn't, and one officer produced a  arrest warrant, so they were allowed to come in and look to see if he in fact was home. After they found that he was not there, they began to search the house without our mother's (the owner) consent and they never produced a search warrant or asked if they could search the home.         There was no one else in the home who could have given the police permission to search her home as she was the only one there who owned the house.  I did not see  the officers take  any of Clinton's belongings from the house and

even as they were leaving there still was never the presentation of a search warrant.  I'm not certain how many officers came into the house and/or searched the house, but there were more than two.  I am certain that no member of the family and positively not my Mother had given the consent to search our home.  Later that night we learned they had arrested Clinton and taken him to the police station.

8.    I declare that this declaration is true and correct to the best of my knowledge and belief, and that it was made in good faith in the above case of Eldridge vs. United States of America, #02-CO-583.

Executed on this _____ day of _____ 2002.

Respectfully Submitted,

Viveca R. Card

1345 Const. Ave. N.E.

Washington, D.C. 20002

# REPORT
## of the

## FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

December 23, 1983

To: Chief of Police
Metropolitan Police Department
Washington, D. C.  20001

FBI FILE NO. 95-258276

Attention: Mr. Charles E. Rinaldi
Assistant Chief of Police
Technical Services Bureau

LAB. NO. 31116021 S WP QQ
31123012 S WP QQ

Re:
CLINTON ELDERIDGE - SUSPECT;
JULIE MC KENZIE - VICTIM;
RAPE/SODOMY/BURGLARY

YOUR NO.
MCL #83-19747
(Curtis)
CCR 525-174

Examination requested by:    Addressee

Reference:    Letters dated November 15, 1983 and November 22, 1

Examination requested:    Chemical Analyses - Microscopic Analyses

Specimens personally delivered by Mr. P. J. Curtis on November 16
under cover of letter dated November 15, 1983 (31116021 S WP QQ):

Q1      Debris collection (#1)

Q2      Pubic hair combing (#2)

Q3      Head hair combing (#4)

Q4-Q5   Vaginal swabs (#6)

Q6-Q7   Oral swabs (#7)

Q8-Q9   Anal swabs (#8)

Q10     Vaginal washing (#12)

Q11     Sweater (#13)

(ove

Page 1

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory report will be used for official purposes only, related to the investigation or a subsequent criminal prosecution. Authorization cannot be granted for the use of the Laboratory report in connection with a civil proceeding.

27a

Q12        Jeans (#14)

Q13-Q14    Socks (#15)

Q15        Undershirt (#16)

Q16        Brassiere (#17)

Q17        Paper bag (#18)

Q18        Panties (#19)

Q18(A)     Sanitary napkin (#19)

K1         Pubic hair sample from victim (#3)

K2         Head hair sample from victim (#5)

K3         Saliva sample from victim (#9)

K4         Blood sample from victim (#10)

ALSO SUBMITTED:

Control swabs (#11)

Specimens personally delivered by Mr. P. J. Curtis on
November 22, 1983, under cover of letter dated November 22, 1
(31123012 S WP QQ):

Q19        Jacket (#21)

Q20        Hat (#22)

Q21        Jacket (#23)

Q22        Hat (#24)

K5         Pubic hair sample from suspect (#27)

K6         Head hair sample from suspect (#28)

K7         Saliva sample from suspect (#29)

K8         Blood sample from suspect (#30)

(ove

28a

Result of examination:

Specimen K6 consists of Negroid head hairs approximately 1/2 to 3/4 inches long, which apparently had not been cut within two weeks of the time of removal from the scalp. The very short length of the K6 hairs precludes the possibility of obtaining significant results from a microscopic comparison. A dark brown Negroid head hair approximately 3 to 4 inches long was found on Q11. This hair is suitable for significant comparisons. No other Negroid hairs were found on or in Q1, Q2, Q3 and Q11 through Q18A. No head hairs like those in K2 and no pubic hairs were found on Q20 and Q21. No Caucasian hairs were found on Q19 and Q22.

No apparent transfer of textile fibers was detected between the items from CLINTON ELDERIDGE and the items from JULIE MCKENZIE.

The other requested Laboratory examinations are continuing. You will be advised of the results of those examinations and the disposition of the submitted items in a subsequent report.

Page 3
31116021 S WP



# REPORT
## of the

### FEDERAL BUREAU OF INVESTIGATION
### WASHINGTON, D. C.  20535

February 24, 1984

To: Chief of Police
Metropolitan Police Department
Washington, D. C.   20001

FBI FILE NO. 95-258276

Attention: Mr. Charles E. Rinaldi
Assistant Chief of
Police

LAB. NO.    31116021 S WP QQ
            31123012 S WP QQ

Re:         Technical Services
            Bureau

YOUR NO.    MCL 83-19747
            (Curtis)
            CCR 525-174

CLINTON ELDERIDGE - SUSPECT;
JULIE MC KENZIE - VICTIM;
RAPE/SODOMY/BURGLARY

Examination requested by:   Addressee

Reference:      Letters dated November 15, 1983 and November 22,

Examination requested:   Chemical Analyses - Microscopic Analyses

Result of examination:

This report supplements the FBI Laboratory report to y
dated December 23, 1983 and completes the requested examinations
Please refer to that report for a detailed listing of the submit
items.  It should be noted that the correct date of delivery of
specimens Q19 through Q22 and K5 through K8 (31123012 S WP QQ) t
the Laboratory by Mr. P. J. Curtis of your department was
November 23, 1983 and not November 22, 1982 as reflected in the
above report.

Grouping tests conducted on the known blood samples fr
the victim and suspect and the human blood identified on the bel
listed specimen disclosed the following:

K4 (victim)     "A, PGM 2-1, EsD 2-1, EAP B, ADA 1-1, AK 1-1
                Hp 2-2, CA II 1-1, PEP A 1-1, G6PD B, Le(a-b-
                (secretor)"

K8 (suspect)    "B, PGM 1-1, EsD 2-1, GLO I 2-2, EAP B, ADA
                AK 1-1, Hp 2-2, Gc 1-1, Tf C, CA II 1-1,

(over)

Page 1

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory report will be used for official purposes only, related to the investigation or a subsequent criminal prosecution.  Authorization cannot be granted for the use of the Laboratory report in connection with a civil proceeding.

25a



Le(a+b-)-(nonsecretor)"

— Q11 —    "A, PGM 2-1, EsD 2-1, AK 1-1, CA II 1-1, PEP A 1-1, G6PD B"

Attempts to further characterize these specimens were inconclusive. Grouping tests conducted on the human blood identified on Q12 and Q21 were inconclusive. Human blood, too limited in amount for conclusive grouping purposes, was identified on Q15. No blood was identified on or in Q4 through Q10, Q13, Q14, Q16, Q18 through Q20 or Q22.

Semen was identified in stains on Q12. Grouping tests conducted on Q12 disclosed the presence of the "A" blood group substance. Attempts to further characterize that specimen were inconclusive. No semen was identified on or in K3, Q4 through Q11, Q13 through Q16 or Q18 through Q22.

In view of the above results, the K3 and K7 saliva samples from the victim and suspect were not grouped.

The submitted items will be retained in the FBI Laboratory until picked up by a representative of your department.



(Rev. 4-26-78)



# REPORT
## of the

### FBI LABORATORY

## FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

To: **Chief of Police**
**Metropolitan Police Department**
**Washington, D. C.  20001**

April 20, 1984

Attention:  **Mr. Charles E. Rinaldi**
**Assistant Chief of Police**
**Technical Services Bureau**

Re:

**CLINTON ELDRIDGE - SUSPECT;**
**JULIE MC KENZIE - VICTIM;**
**RAPE/SODOMY/BURGLARY**

FBI FILE NO.

95-258276

LAB. NO.

40321076 S QQ

YOUR NO.

MCL #83-19490
(Whetzel)
CCN #518-110

Examination requested by:  **Addressee**

Reference:  **Letter dated March 20, 1984**

Examination requested:  **Microscopic Analyses**

**Specimen personally delivered by Technician Jason R. Whetzel on March 20, 1984:**

**K9   Head hair sample of CLINTON ELDRIDGE**

**Result of examination:**

The dark brown Negroid head hair previously found on Q11 which is listed in FBI Laboratory report 31116021 S WP QQ dated December 23, 1983, is unlike K9. Accordingly, CLINTON ELDRIDGE cannot be considered a source of this hair.

①- **Charles Hall, Esq.**
**U. S. Attorney's Office**
**Room 5318**
**D. C. Courthouse**
**500 Indiana Avenue**
**Washington, D. C.  20001**

**Page 1**

**(over)**

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory report will be used for official purposes only, related to the investigation or a subsequent criminal prosecution.  Authorization cannot be granted for the use of the Laboratory report in connection with a civil proceeding.

Appendix D

It is stated in FBI Laboratory report 31114042 S TK QQ dated January 26, 1984, that no Negroid hairs other than pubic hairs were found in that case.

The submitted item is being temporarily retained in the FBI Laboratory until called for by a representative of your department.

Page 2
40321076 S QQ

24a

of the

FBI LABORATORY

# FEDERAL BUREAU OF INVESTIGATION
## WASHINGTON, D. C. 20535

To Chief                                                      March 23, 1984
Metropolitan Police Department
Washington, D. C. 20001

Attention: Mr. Charles E. Rinaldi        FBI FILE NO. 95-257859
           Assistant Chief of Police    LAB. NO.    31021038 S UF QQ
Re:        Technical Services Bureau
                                        YOUR NO.    MCL #83-18082
CLINTON ELDERIDGE - SUSPECT;                        (Mack)
VIRGINIA L. MC NAIR - VICTIM;                       CCN #482-438
RAPE

Examination requested by:    Addressee

Reference:                   Letter dated October 21, 1983

Examination requested:       Chemical Analyses - Microscopic Analyses

Specimens personally delivered by Mr. BOOKER MACK on
October 21, 1983:

Q1          Panties (1)

Q2          Tampon (2)

Q3          Carpet (4)

Q4          Towel (6)

Q5          Blouse (8)

Q6          Panties (9)

Q7          Tampon (10)

Q8          Vaginal swab (17)

Page 1                                                (over)

This examination has been made with the understanding that the evidence is connected with an official investigation of a criminal matter and that the Laboratory report will be used for official purposes only, related to the investigation or a subsequent criminal prosecution. Authorization cannot be granted for the use of the Laboratory report in connection with a civil proceeding.

Q9        Oral swab (18)

Q10       Unknown substance (21)

Q11       Head hair combings (13)

Q12       Pubic hair combings (11)

K1        Blood sample from victim (16)

K2        Saliva sample from victim (15)

K3        Head hairs from victim (14)

K4        Pubic hairs from victim (12)

ALSO SUBMITTED:

        Control swab (20)

        Unmarked swab (19)

Result of examination:

        The K1 blood sample was grouped as "A, RhD, PGM 2-1, EsD 1-1, GLO I 2-1, EAP BA, ADA 2-1, Hp 1-1, Gc 2-1, Tf C, Le(a-b+)(secretor)." Attempts to further characterize this specimen were inconclusive.

        Human blood, which was not further characterized, was identified on specimens Q2 and Q7. Blood, which was not further characterized, was identified on specimens Q8 and Q9. No blood was found on specimens Q1, Q3 through Q6 or Q10.

        Semen was identified on specimens Q5 through Q8 and Q10. Grouping tests conducted on these stains disclosed the presence of the "H" blood group substance. No semen was found on specimens Q1, Q3, Q4 or Q9.

        The K2 saliva sample was not examined inasmuch as the secretor status of the victim was determined through grouping tests conducted on the K1 blood sample.

        District of Columbia Assistant United States Attorney DON ALLISON telephonically requested this LABORATORY to compare any Negroid head hairs or pubic hairs recovered in this case with hair samples from CLINTON ELDERIDGE. ELDERIDGE is a suspect in the alleged rape and sodomy of JULIE MC KENZIE who is listed as the victim in an FBI LABORATORY report dated December 23, 1983,

to your department (31116021 S WP QQ).  However, no Negroid hairs were found on or in Q1 through Q7, Q11 and Q12.

Foreign textile fibers were removed from Q1 and Q3 through Q6 and were placed in pillboxes for possible future comparisons. No foreign fibers were found on Q2 and Q7.

The submitted items will be temporarily retained in the FBI LABORATORY for a period of 45 days from the date of this report. If the submitted items are not picked up during that period or other arrangements made, they will be returned to you by registered mail,

3/79     METROPOLITAN POLICE DEPARTMENT - Washington, D.C. - MEDICAL EXAM OF ALLEGED SEXUAL ASSAULT VICTIM

**General Information:** a. Name _McNair, Virginia_     b. Alleged Assault: Date _10-13-83_ Time _1920_
c. DOB _8-25-45_ d. Age _34_ Sex _F_ f. Race _W_     g. Police Notified: Date _10-13-83_ Time _1920_
h. Address _1305 E Capitol St._     i. Medical Exam: Date _11-A-83_ Time _____
j. Phone _547-4722_     Location (Name) _D.C. General_
k. Parent/Guardian /     l. Type of Alleged Assault _Anal & Vaginal_

**TO BE COMPLETED BY EXAMINING PHYSICIAN - PLEASE USE INSTRUCTIONS ON REVERSE SIDE**

2. General Appearance: WOMAN W ♀ alert, oriented, appropriate

3. General Physical Complaints: Head Face Neck Chest Abdmn Back Arms Legs Perineum Anus Ext. Genitalia Description:
   a. Pain
   b. Soreness
   c. Tenderness
   d. Other

4. General Physical Exam: Head Face Neck Chest Abdomen Back Arms Legs Description:
   a. Bruises
   b. Redness
   c. Swelling
   d. Lacerations — Ant. spine superficial
   e. Blood — ® aspect vaginal introitus

5. Gynecological/Anal Exam: Perineum Labia Introitus Vagina Cervix Anus Penis/Scrotum Description:
   a. Bruises
   b. Redness
   c. Swelling
   d. Lacerations — superficial — ® introitus
   e. Blood — not actively
   f. Discharge
   Additional Description:
   a. Introitus (incl. approx. size in children)
   b. Hymen Condition
   c. Anal Tone _Normal_

6. General Behavior:
   a. Calm ☑Yes ☐No   b. Sluggish ☐Yes ☑No   Description:
   c. Yes-No Response Only ☐Yes ☑No   d. Withdrawn ☐Yes ☑No
   e. Crying ☐Yes ☑No   f. Angry ☐Yes ☑No
   g. Over-Talkative ☐Yes ☑No   h. Restless ☐Yes ☑No
   i. Agitated ☐Yes ☑No   j. Hysterical ☐Yes ☑No
   k. Support Person Needed ☐Yes ☑No   l. Other ☐Yes ☐No

7. Additional Observations/Remarks

8. Diagnosis/Impressions: Alleged Sexual assault anal, vaginal — ① trauma to ftnc

9. Medical Evaluation: In your opinion are the medical findings above suggestive of and/or compatible with:
   a. General Physical Exam   Yes-Recent  Yes-Past  No  Unknown  Comments:
      1. Injury Resulting From Violence
   b. Gynecological/Anal Exam
      1. External Genital Contact
      2. Labia Penetration
      3. Vaginal Penetration
      4. Anal Penetration
      5. Oral Contact

10. Testing   Done Not Done  Type   Result   Vagina Anal Oral  Comments:
    a. Semen
    b. Sperm
    c. Gonorrhea
    d. Syphilis
    e. Pregnancy
    f. Other

11. Diagnostic Procdrs  Done Not Done  Type   Result   Recommended Skull + Neck X-R
    a. X-Ray
    b. Consultation
    c. Other

12. Treatment  Done Not Done  Type  Purpose
    a. Hospitalization
    b. Suturing
    c. Medication — Penem112 4 gm PO, Wycillin 4.8 mil IM
    d. Other

13. Instructions for Follow-up:
    _P. Nguyen, MD_
    Signature of Examining Physician          Signature of Police Representative

I hereby authorize _____ to release the original copy of this report and copies of any other reports pertaining to this examination (including reports of laboratory and diagnostic procedures) to the D.C. Metropolitan Police Department, the D.C. Department of Human Resources, the Office of the United States Attorney of D.C., and the Office of the Corporation Counsel of

T-1a (Rev. 4-26-78)

# REPORT
## of the



**FBI LABORATORY**

## FEDERAL BUREAU OF INVESTIGATION
### WASHINGTON, D. C.  20535

To: Chief of Police
Metropolitan Police Department
Washington, D. C.  20001

**January 26, 1984**

FBI FILE NO.

Attention: Mr. Charles E. Rinaldi
Assistant Chief of Police
Technical Services Bureau

LAB. NO.  31114042 S TK QQ

Re:

YOUR NO.  MCL #83-19490
(Whetzel)
CCR #518-110

CLINTON T. ELDERIDGE - SUSPECT;
HARRIET WEIL - VICTIM;
RAPE

Examination requested by:  Addressee

Reference:  Letter dated November 10, 1983

Examination requested:  Chemical Analyses - Microscopic Analyses

Specimens personally delivered by Mr. J. R. Whetzel on
November 14, 1983:

Q1      Sheet (#1)

Q2      Robe (#2)

Q3      Jogging pants (#14)

Q4      Debris from victim (#3)

Q5      Pubic hair combings from victim (#4)

Q6      Head hair combings from victim (#6)

Q7-Q8   Oral swabs (#10)

Q9-Q10  Vaginal swabs (#12)

Page 1

(over)

Q11-Q12    Anal swabs (#13)

K1         Pulled pubic hair from victim (#5)

K2         Pulled head hair from victim (#7)

K3         Known saliva sample from victim (#8)

K4         Known blood sample from victim (#9)

ALSO SUBMITTED:

       Two control swabs (#11)

Result of examination:

       District of Columbia Assistant United States Attorney
Don Allison telephonically requested that any Negroid head hairs
or pubic hairs recovered in this case be compared to head and
pubic hair samples from Clinton Elderidge. Elderidge is a suspect
in the alleged rape and sodomy of Julie McKenzie who is listed as
the victim in FBI Laboratory report 31116021 S WP QQ dated
December 23, 1983 to your department. Three dark brown Negroid
pubic hairs were found on Q1. These three hairs exhibit the same
microscopic characteristics as the pubic hair sample from Elderidge;
therefore, he can be considered a source of these three hairs. It
is pointed out that hair comparisons do not constitute a basis for
absolute personal identification. No other Negroid hairs were
found on or in Q1 through Q6.

       Foreign textile fibers were removed from Q1, Q2 and Q3.
These fibers have been placed in pillboxes for possible future
comparisons.

       The other requested examinations are continuing. You
will be advised of those results and the disposition of the sub-
mitted items by a separate report.

224 3/79    METROPOLITAN POLICE DEPARTMENT - Washington, D.C. - MEDICAL EXAM OF ALLEGED SEXUAL ASSAULT VICTIM

**General Information:** a. Name **WEIL, HARRIET**
b. Alleged Assault: Date **11-3-93** Time **17²**
c. DOB **6-29-59** d. Age **34** e. Sex **F** f. Race **W**
g. Police Notified: Date **11-3-93** Time **175**
h. Address **1719 N CAP NE**
i. Medical Exam: Date **11-3-93** Time **2 00**
j. Phone **546-1706**
Location (Name) **DC Gen.**
k. Parent/Guardian
l. Type of Alleged Assault **VAGINAL, ANAL, R**

**TO BE COMPLETED BY EXAMINING PHYSICIAN - PLEASE USE INSTRUCTIONS ON REVERSE SIDE**

2. General Appearance: **WD - WN W/E NAD — Calm & well** **34 au 17**
**oriented**

3. **General Physical Complaints**

| | Head | Face | Neck | Chest | Abdmn | Back | Arms | Legs | Perineum | Anus | Ext. Genitalia | Description: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| a. Pain | ☐ | ☒ | | | | | | | | | | **Abrasion to l** |
| b. Soreness | ☒ | ☒ | | | | | | | | | | **laceration to** |
| c. Tenderness | ☒ | | | | | | | | | | | **5 lip -upper** |
| d. Other | | | | | | | | | | | | |

4. **General Physical Exam**

| | Head | Face | Neck | Chest | Abdomen | Back | Arms | Legs | Description: |
|---|---|---|---|---|---|---|---|---|---|
| a. Bruises | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| b. Redness | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| c. Swelling | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| d. Lacerations | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| e. Blood | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |

5. **Gynecological/Anal Exam**

| | Perineum | Labia | Introitus | Vagina | Cervix | Anus | Penis/Scrotum | Description: |
|---|---|---|---|---|---|---|---|---|
| a. Bruises | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| b. Redness | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | **yellow vaginal D/c** |
| c. Swelling | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | **non foul** |
| d. Lacerations | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| e. Blood | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| f. Discharge | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | |

**Additional Description:**
a. Introitus (incl. approx. size in children) _____
b. Hymen Condition _____
c. Anal Tone **Strong**

6. **General Behavior**

| | Yes | No | | | Yes | No | Description: |
|---|---|---|---|---|---|---|---|
| a. Calm | ☒ | ☐ | b. Sluggish | | ☐ | ☒ | **very calm & well** |
| c. Yes-No Responses Only | ☐ | ☒ | d. Withdrawn | | ☐ | ☒ | **oriented.** |
| e. Crying | ☐ | ☒ | f. Angry | | ☒ | ☐ | |
| g. Over-Talkative | ☐ | ☒ | h. Restless | | ☐ | ☒ | |
| i. Agitated | ☐ | ☒ | j. Hysterical | | ☐ | ☒ | |
| k. Support Person Needed | ☐ | ☒ | l. Other | | ☐ | ☐ | |

7. Additional Observations/Remarks

8. Diagnosis/Impressions **R/O Sexual Assault.**

9. **Medical Evaluation:** In your opinion are the medical findings above suggestive of and/or compatible with:

a. General Physical Exam

| | Yes-Recent | Yes-Past | No | Unknown | Comments: |
|---|---|---|---|---|---|
| 1. Injury Resulting From Violence | ☒ | | | | **To face** |

b. Gynecological/Anal Exam

| | Yes-Recent | Yes-Past | No | Unknown | |
|---|---|---|---|---|---|
| 1. External Genital Contact | ☐ | ☐ | ☒ | | |
| 2. Labia Penetration | ☐ | ☐ | ☒ | | |
| 3. Vaginal Penetration | ☐ | ☐ | ☒ | | |
| 4. Anal Penetration | ☐ | ☐ | ☒ | | |
| 5. Oral Contact | ☐ | ☐ | ☒ | | |

10. **Testing**

| | Done | Not Done | Type | Result | Vagina | Anal | Oral | Comments: |
|---|---|---|---|---|---|---|---|---|
| a. Semen | ☒ | ☐ | | | ☒ | ☒ | ☒ | |
| b. Sperm | ☒ | ☐ | | | ☒ | ☒ | ☒ | |
| c. Gonorrhea | ☒ | ☐ | | | ☒ | ☒ | ☒ | |
| d. Syphilis | ☒ | ☐ | | | | | | |
| e. Pregnancy | ☒ | ☐ | | | | | | |
| f. Other | ☒ | ☐ | **Hair - pubic/head** | | | | | |

11. **Diagnostic Procdrs**

| | Done | Not Done | Type | Result |
|---|---|---|---|---|
| a. X-Ray | ☐ | ☒ | | |
| b. Consultation | ☐ | ☒ | | |
| c. Other | ☐ | ☒ | | |

12. **Treatment**

| | Done | Not Done | Type | Purpose |
|---|---|---|---|---|
| a. Hospitalization | ☐ | ☒ | | |
| b. Suturing | ☐ | ☒ | **PCN 4.8 KU** | |
| c. Medication | ☒ | ☐ | **to prevent...** | |
| d. Other | ☐ | ☐ | | |

13. Instructions for Follow-up: **back Gyn triage**
**C.J. Sawyer MD** **Dr. M.J. Vaccaro**
Signature of Examining Physician **594** Signature of Police Representative

I hereby authorize _____ to release the original copy of this report and copies of any other reports pertaining to this examination (including reports of laboratory and diagnostic procedures) to the D.C. Metropolitan Police Department, the D.C. Department of Human Resources, the Office of the United States Attorney of D.C., and the Office of the Corporation Counsel of D.C. to be used for official purposes.

**Harriet L. Weil**
Signature of Person Examined